**UNITED STATES of America,**
**Appellee,**

v.

**Clarence Samuel BEACH, Appellant.**
**No. 8304.**

United States Court of Appeals
*Fourth Circuit.*

Argued Oct. 2, 1961.

Decided Nov. 10, 1961.

R. R. Ryder, Richmond, Va., for appellant.

Plato Cacheris, Asst. U. S. Atty., Alexandria, Va. (C. V. Spratley, Jr., U. S. Atty., Alexandria, Va., on brief), for appellee.

Before SOBELOFF, Chief Judge, BOREMAN, Circuit Judge, and MICHIE, District Judge.

MICHIE, District Judge.

Clarence Samuel Beach was convicted by a jury in the United States District Court for the Eastern District of Virginia on three counts of a five count indictment for perjury alleged to have been committed before a grand jury investigating a numbers lottery in Richmond, Virginia. On the other two counts the court granted a judgment of acquittal at the conclusion of the government's evidence.

The court sentenced the defendant to the custody of the Attorney General of the United States of America for a term of three years and from this judgment of conviction the defendant appealed to this court.

The first count upon which Beach was convicted, count 2 of the indictment, alleges that Beach testified falsely before the grand jury when he testified that he

did not know the identity of three men who were seen going into, coming from and using a certain room in the home of one Hugh Childress. The second count on which Beach was convicted, count 3 of the indictment, charges that Beach committed perjury in stating that he had not seen Leo Seay at the Childress home on several occasions and did not know the identity of a man he saw there from time to time who was in fact Seay. And the third count upon which Beach was convicted, count 5 of the indictment, alleges that Beach committed perjury in stating that he had not heard certain machinery in operation inside a certain room in Childress' home.

On appeal Beach presents two points. His first point is that all of the government's evidence was of a circumstantial nature and that circumstantial evidence standing alone is insufficient to sustain a conviction for the crime of perjury. His second point is that the court committed prejudicial error in allowing the jury over the objection of defense counsel to take an electric drop cord into the jury room while the jury was considering the case.

In the view we take of the case it will be necessary to discuss both of these points.

## I.

### The Sufficiency of the Evidence

The appellant contends that the crime of perjury cannot be established by circumstantial evidence alone and argues that nothing but circumstantial evidence was produced against him at the trial. We think, however, that there was ample direct evidence, corroborated by circumstantial evidence, to sustain the verdict and so we do not have to pass upon the question of whether circumstantial evidence alone could be sufficient to sustain a conviction, though it has been so held in a number of cases, including U. S. v. Collins, 272 F.2d 650 (2nd Cir. 1959) cert. den. 80 S.Ct. 681, 362 U.S. 911, 4 L.Ed.2d 619, where the accused had sworn that certain minutes had been typed and signed by him on a certain date

and the sole proof of perjury was evidence of a designer of type for IBM who testified that the type style used in the minutes had not been invented until nearly two years after the minutes were alleged to have been signed.

This result, however, did not really constitute a departure from the spirit of the so-called "two-witnesses" rule which itself is really nothing but a short-cut way of stating that in a perjury trial the evidence must consist of something more convincing than one man's word against another's. Obviously where the perjury relates to the accused's state of mind, such as what he knew or saw or heard, proof can only be made by proof of facts from which the jury will infer that the accused *must* have known or seen or heard what he had denied knowing or seeing or hearing. "This is necessarily so because in the nature of things it is not possible for the prosecution to prove, except through circumstantial evidence, that the accused actually remembered the facts that he had formerly sworn to." Behrle v. U. S., 69 App.D.C. 304, 100 F.2d 714, 715. "Hence the doctrine that perjury must be proved by the direct testimony of two witnesses or one corroborated witness means that the witnesses must testify to some 'overt act' from which the jury may 'infer' the accused's actual belief." U. S. v. Remington, 2 Cir., 191 F.2d 246, 249.

As the evidence supporting the conviction on count 2 with respect to the defendant's knowledge of the identity of the three men who were seen going into, coming from and using the room in the Childress home is substantially the same as the evidence supporting count 3 with respect to the defendant's having seen Leo Seay on several occasions at the Childress house and knowing who he was, we will treat these two counts together and then turn to the sufficiency of the evidence supporting the conviction on count 5.

### Counts 2 and 3

The defendant Beach was a close friend of Mr. and Mrs. Childress who

lived in a house at 5315 Chamberlayne Avenue in Henrico County, Virginia. He visited them there practically every day, usually in the afternoon or evening. He testified that while he was in a restaurant he heard three men who were unknown to him talking about wanting to rent a room and he told them that Mr. and Mrs. Childress might be willing to rent them a room. He denies recognizing any of the men at the time and definitely denies that any of them were any of the three men who later rented a room from the Childresses, although he states that he never saw the men who rented a room from the Childresses clearly enough to recognize who they were. The men were evidently connected with a numbers operation and they put in the room rented by them in the Childress house certain adding machines and came to the room daily in the afternoon, working there for several hours with the adding machines.

The three men who rented a room in the Childress home and were seen going to and from the home were Leo Seay, George Smethie and Raymond Walker. Mr. Seay testified that he had known the defendant Beach for about 28 years and Mr. Beach stated before the grand jury that he had known Mr. Seay for about 25 years. Mrs. Childress testified that Mr. Beach had talked to her about going hunting with Mr. Seay.

Smethie said, "I have been knowing Clarence (the defendant) but I never knew his name, I just knew him by sight until just recently," explaining that recently was about six months before the trial.

The defendant admits he saw the three men at the house but states that he did not see them clearly enough to recognize any of them. Yet he definitely denies that Seay was one of them. To be able to make such a denial he must have seen them clearly enough to recognize any of them that he knew.

Mrs. Childress testified that Seay came about 3:30 every day, usually with Smethie and sometimes with Walker. She also testified that Beach was at her home practically every day. She testified that Beach was in the same room with Smethie, Seay and Walker at times and that he had been in the kitchen with Mrs. Childress when the three came into the kitchen. She testified that she heard Mr. Beach call Mr. Seay by name although she didn't hear him call either of the others by name—but then she later retracted and said she never heard Mr. Beach call Mr. Seay by name although her testimony to the grand jury was likewise to the effect that she had heard Beach call Seay by name.

At first Mr. Beach testified that he never saw any one of the men who had rented a room in the Childress house but was merely told of it but later he admitted that he did see them but stated that he did not see them clearly enough to recognize any of them. And he repeated that Leo Seay was not one of them—though the fact that Leo Seay was one of them is testified to by every other witness. Later he again denied that he recognized any of the men stating that it was too dark at the time he saw them but then he immediately stated that Seay was not one of them.

Mr. Smethie, one of the three men in question, stated that he had seen Mr. Beach in the company of Mr. and Mrs. Childress a few times a week during the last four months of 1959. Is it possible that Mr. Beach did not see Mr. Smethie on those numerous occasions?

Mr. Smethie also testified that he had seen Mr. Walker in the company of Mr. and Mrs. Childress and Mr. Beach. Mr. Walker testified that he had seen Mr. Beach in the company of Mr. Seay and Mr. Smethie three or four times from September 1959 until the end of the year.

A government agent who had Seay, Smethie and Walker and the Childress house under surveillance testified that on November 3, 1959, Beach drove up to the house, parked his car and entered the house. At 3:10 p.m. a station wagon with unidentified occupants parked toward the rear of the Childress lot. Shortly thereafter Beach came out of the house, went to the station wagon and talked with the occupants. At 3:13 p.m.

Smethie and Seay drove to the parking area of the Childress house. They sat in the car for a few minutes and Beach talked to Smethie. At 3:18 p. m. Walker drove up, parked his car and entered the house. Beach then went back to the station wagon and the station wagon then left and Smethie and Seay walked into the house.

Here we have Beach talking to Smethie in broad daylight with Seay in the car with Smethie and with Walker apparently in the same area as the car by the side of which Beach was standing and getting out and going into the house. It is incredible that at the time and under the circumstances Beach did not recognize these men, one of whom he admits having known for twenty-five years.

It is perhaps a rather small point but it is in evidence that Mrs. Childress, evidently worried about the activities of the three men in her home, made some inquiry of Beach and Beach told her, "If you don't worry no men, they are not going to bother you."

We have, therefore, the direct evidence of the defendant Beach and Seay that they had known each other for years and of Smethie that he knew Beach. We have the direct evidence of Mrs. Childress that Beach was in the same room with the three men at times and of Smethie and others, respectively, that they had each seen Beach in the company of the others and of Mr. and Mrs. Childress a number of times. We have the direct testimony of the government agent that Beach was talking to Smethie when Seay, whom Beach admittedly had known for years, was seated in the car beside Smethie. This is ample to support the jurors' conclusion that Beach committed prejury when he swore that he did not know the identity of these men and that Leo Seay was not one of them.

■ Counsel for the defendant argues that the testimony above referred to still does not justify a conviction under count 2 of the indictment because that count alleges that Beach "well knew the identity of the three men who were seen going

into, coming from and using the said room in the said home". Counsel says, correctly, that none of the foregoing shows that Beach himself *saw the men* "*going into, coming from and using*" *the room* in question and counsel says that to convict under that count the prosecution must prove that Beach himself saw the men "going into, coming from and using the room". However we do not believe that this is a fair construction of the count. The count does not allege that Beach *saw* the men going into, coming from and using the room. It charges that he *knew the identity* of the men who *were seen*, i. e., by Beach or others, going into, coming from and using the room. Counsel argues in fact that the chair Beach usually used in visiting the Childresses was so located that he could not see the door of the room but the argument inferentially admits that the Childresses could see the door. And it is absurd to argue that in a house as small as the one in question the men could be going into the room in question daily without being seen by someone. In other words the charge is that Beach committed perjury when he denied that he knew the identity of the three men and the remainder of the count is merely descriptive of who the men in question were of whose identity Beach had denied knowledge.

### Count 5

■ Turning now to the third count upon which the defendant was convicted, count 5, the testimony is again ample to support the conclusion of the jury that the defendant committed perjury when he stated that he did not hear the adding machines in operation inside the room in the Childress house.

There is no intimation anywhere in the record that Beach's sense of hearing was in any way defective so we must assume that he had normal hearing.

A picture of the Childress house is in evidence and it shows a tiny little bungalow type of house. The picture itself is almost adequate evidence that anyone with normal hearing in any part of the

house must have heard adding machines in operation in any other part of the house.

Again we must remember that Beach was in the house practically every day, usually in the later part of the afternoon, and that the three men were working with the machines at that time. Mrs. Childress heard the noise of the adding machines and on one occasion when her radio was not operating clearly Beach and Mr. Childress asked her what was the matter with the radio and she replied, "I reckon it's them adding machines." Later she found it was static in the radio, however.

Mrs. Childress testified that her husband and Mr. Beach would sometimes have the radio on for a ballgame when the adding machines were running. Mr. Childress testified that sometimes the machines bothered him so, along with other things, that he went upstairs to get peace and quiet and that he could still hear the machines upstairs though they did not keep him from sleeping.

We conclude therefore that in the absence of any testimony indicating that Mr. Beach's hearing was defective he must have heard the machines.

It follows therefore that the evidence is sufficient to sustain the verdict upon all three counts upon which the defendant was convicted.

## II.

### The Argument with Respect to the Electric Drop Cord

After the jury retired to consider its verdict they sent back a message requesting the court to send to them an electric drop cord. The defense attorney was then absent from the room. The court had an electric drop cord delivered to the jury and so advised defense counsel upon his return to the court room. Defense counsel immediately objected on the ground that the jury obviously wanted the cord in order to test the amount of noise made by the running of the adding machines. The adding machines had been introduced in evidence and sent to

the jury in the jury room. However when in operation in the Childress home there was under each of the machines a foam rubber pad some two inches in thickness. This foam rubber padding had been detached from the machines when they were introduced in evidence. The padding was also separately introduced in evidence and sent to the jury room but was not on the machines when the machines and padding were sent to the jury room.

Counsel for the defendant states that he has reason to believe that the jury tested the operation of the machines in the jury room, presumably without putting the padding back on the machines and presumably under conditions otherwise different from those existing in the room in the Childress house. Indeed it is difficult to imagine for what purpose the jury wanted the electric drop cord if it was not to make such a test. And counsel contends that a test under these conditions was improper.

We must agree with counsel for the defendant in this respect.

The law is well settled that a case must be decided upon evidence submitted in court during the trial and not upon private experiments of the jurors.

"A jury may not conduct experiments which have the effect of putting them in possession of evidence not offered at the trial. Jurors conducting such an experiment are guilty of misconduct warranting a new trial, unless in the circumstances no prejudice results, as where the verdict has already been agreed upon and is clearly right. Improper experiments include experiments with firearms to test the truth of testimony, and ascertainment by jurors for themselves whether voices can be heard out-of-doors, whether signatures can be perfectly traced, or whether a worn shoe would make tracks described at the trial.

"However, the mere making of a more critical examination of an exhibit than was made during the trial

is not objectionable. For example, the use of a magnifying glass not introduced in evidence, without the knowledge and consent of the parties and without permission of the court, is not reversible error where such action involves merely a more critical examination of an exhibit. But the rule is otherwise where the effect is to put the jury in possession of evidence not introduced at the trial." 53 Am.Jur. 644–5.

It is true that there is an early Virginia case which appears to be contrary to the general rule, Taylor v. Com., 90 Va. 109, 17 S.E. 812. In that case the accused was charged with murder and hulls fired from the gun with which the murder was committed were introduced in evidence. The prisoner in the course of the trial had a friend fire the prisoner's gun four times and introduced in evidence the four cartridge hulls fired from the gun during the trial to show the jury that they were struck by the plunger of the prisoner's gun in a different manner from that in which the two cartridge hulls which had been put in evidence as picked up on the scene of the murder had been struck. In the course of their deliberations the jury sent for the gun that had been fired during the trial, took it to pieces, examined the plunger and found that it had recently been tampered with, the effect of which would be to make it make a mark on the cartridge hulls different from the marks that had previously been made.

█ The court held that the action of the jury was not improper. It is somewhat difficult to reconcile this holding with the general rule. But though the gun itself had not been put in evidence in the trial it had been used in the course of the trial and the shells with the marks made upon them had been placed in evidence, so that perhaps it could be said that this case comes within the rule that "the mere making of a more critical examination of an exhibit than was made during the trial is not objectionable." And furthermore no objection was made by counsel for the accused to the sending

of the gun to the jury room. At any rate, if the case can be construed as permitting the jury to go outside of the evidence and conduct experiments of their own, it is clearly out of line with the overwhelming weight of authority and we are not obliged to follow it. We hold therefore that it was error to send to the jury an electric drop cord if that cord was used in experimenting with the adding machines.

The government contends however that if the sending of the electric drop cord to the jury was error it was harmless error because the defendant was convicted and sentenced on all three counts with the sentences to run concurrently. And so the government contends that if the verdict on the fifth count, relating to whether or not the defendant heard the adding machines in operation at the Childress home, must be set aside if the electric drop cord was used by the jury that fact would have no effect on the verdict of guilty on the other two counts.

However we believe that the government oversimplifies the question. The defendant was charged with testifying falsely as to three different matters. The jury may have been in doubt as to all three when they sent for the drop cord. If so, and if they then proceeded to operate the machines with the drop cord under conditions quite different from those which existed in the Childress home, they might very well have come to the conclusion that the defendant had testified falsely as to hearing the machines.

Having themselves proved to their satisfaction that the defendant was lying about not hearing the machines in operation the jury might then, in case of doubt as to the other two counts, easily have been influenced to find that the defendant was lying with respect to the other two matters also.

█ The government argues that this error is cured by the court's charge that "in determining the guilt or innocence of the defendant in reference to each one of these counts individually, that is, you shall consider each count as a separate

and distinct charge." But jurors' minds are not that easily compartmentalized. Once convinced that the defendant was lying with respect to one count it would become easy for any normal juror to conclude that he was lying on the other two counts as to which they might otherwise have had doubts.

Certainly it would have been error to permit the introduction of evidence to the effect that the defendant had previously committed perjury in another entirely extraneous matter not involved in this case at all. It would seem to follow that improper proof of lying as to one count included in this case would be equally, if not more, prejudicial.

It follows therefore that if the jury did in fact experiment with the adding machines by the use of the electric drop cord the verdict on all three counts must be set aside and a new trial awarded the defendant.

The case is therefore remanded to the District Court with instructions to make inquiry as to whether or not the jury did in fact experiment with the adding machines by the use of the electric drop cord. If so the defendant will be given a new trial on all three counts. If not the verdict and sentence will stand affirmed on all three counts.

 In this connection it would appear entirely proper to inquire directly of the jurors whether or not they did make such an experiment. Such an inquiry would not, we think, result in an improper impeachment of their own verdict by the jury. See Wigmore on Evidence, 3d Ed., §§ 2352 and 2353 and Burk's Pleading and Practice, 4th Ed., pp. 598–600 in each of which is quoted the distinction made by Mr. Justice Brewer in Perry v. Bailey, 12 Kan. 539, 545 as follows:

> "Public policy forbids that a matter resting in the personal consciousness of one juror should be received to overthrow the verdict, because being personal it is not accessible to other testimony; it gives to the secret thought of one the power

to disturb the expressed conclusions of twelve; its tendency is to produce bad faith on the part of a minority, to induce an apparent acquiescence with the purpose of subsequent dissent; to induce tampering with individual jurors subsequent to the verdict. But as to overt acts, they are accessible to the knowledge of all the jurors; if one affirms misconduct, the remaining eleven can deny; one cannot disturb the action of the twelve; it is useless to tamper with one, for the eleven may be heard. Under this view of the law the affidavits were properly received. They tended to prove something which did not essentially inhere in the verdict, an overt act, open to the knowledge of all the jury, and not alone within the personal consciousness of one."

Remanded for further proceedings in accordance herewith.