**UNITED STATES of America,**
**Appellee,**

v.

**Martin SWEIG, Defendant-Appellant.**
**No. 694, Docket 35503.**

United States Court of Appeals,
Second Circuit.

Argued March 26, 1971.

Decided April 14, 1971.

Certiorari Denied June 21, 1971.
See 91 S.Ct. 2256.

See also D.C., 316 F.Supp. 1148.

Whitney North Seymour, Jr., U. S. Atty., S. D. N. Y. (Richard Ben-Veniste, Peter F. Rient, William B. Gray and Ross Sandler, Asst. U. S. Attys. on the brief), for appellee.

Manuel Katz, Boston, Mass. (Paul T. Smith and Morris M. Goldings, Boston, Mass., on the brief), for defendant-appellant.

Before LUMBARD, Chief Judge, and KAUFMAN and HAYS, Circuit Judges.

LUMBARD, Chief Judge:

Martin Sweig appeals from a judgment of conviction on one count of perjury, en-

tered on September 3, 1970, in the Southern District of New York, after a sixteen-day jury trial before Judge Frankel. On the same day, Sweig was sentenced to a term of thirty months in jail and was fined $2,000; execution of his sentence was stayed and he is presently enlarged on bail pending appeal. We affirm the conviction.

The fifteen-count indictment in this case charged Sweig and Nathan Voloshen with conspiracy and related offenses of false personation, conflict of interest, and perjury. Count One alleged that Voloshen, who lived and had an office in New York City, and Sweig, who had been an administrative assistant to Speaker of the United States House of Representatives John W. McCormack for 23 or 24 years, conspired to defraud the United States by using the influence of the Speaker's office to benefit Voloshen's clients who had matters pending before various federal departments and agencies by applying and attempting to apply improper influence upon officials in said departments and agencies, in violation of 18 U.S.C. § 371. Count Two charged Voloshen alone with false personation of a federal officer in violation of Title 18 U.S.C. § 912. Count Three charged Sweig and Voloshen with conflict of interest in violation of 18 U.S.C. §§ 205 and 2. Counts Four through Twelve charged Sweig with perjury in his grand jury testimony of October 15, 1969, in violation of 18 U.S.C. § 1621. Counts Thirteen through Fifteen charged Voloshen with perjury in his grand jury testimony of August 5 and 19, 1969.

Voloshen pleaded guilty before trial to Counts One, Thirteen, Fourteen and Fifteen. As for Sweig, Count Three was dismissed prior to trial for lack of venue, Counts Four and Nine were dismissed by the court at the close of the government's case, and Count Five was withdrawn by the government at the same time. On July 7, 1970, the jury acquitted Sweig on Counts One, Seven, Eight, Ten, Eleven, and Twelve, and found him guilty on Count Six, one of the perjury counts.

With respect to Count Six, the only count on which Sweig was convicted, the government's proof at trial showed that Sweig made numerous telephone calls to military personnel in 1968 and 1969 on behalf of Gary Roth and Roger Warner, two of Voloshen's clients; that these telephone calls were made in Sweig's official capacity as assistant to the Speaker in order to help secure benefits for those clients, such as discharge from the Army or a better assignment within the Army; and that on October 15, 1969, in sworn testimony before a federal grand jury sitting in the Southern District of New York, Sweig falsely denied ever hearing of Roth and falsely stated that he had not made telephone calls relating to servicemen for Voloshen for three years or five years preceding the date of his appearance before the grand jury. Specifically, Sweig's allegedly false testimony was as follows (with the particular answers charged by the government as perjurious marked in brackets):

Q. I take it you've made various phone calls on Mr. Voloshen's behalf to certain people, is that correct? A. Yes, sir.

Q. For instance, could you give us an example of some of the people that you called at Mr. Voloshen's urging? A. Well, he'd come down and, say, with a service case,—a boy in the service, who applied for a Compassionate Re-assignment, or a Hardship Discharge,—I have no hesitancy in calling up the appropriate army officer, to find out the status of that application.

Q. Can you give us one of the names? A. Oh, gee, there were so many now; I just don't remember now.

\* \* \* \* \* \*

[Q. Or Mr. Roth, did you ever hear that name in connection with one of these military cases? A. No.]

\* \* \* \* \* \*

Q. When did you do this for Mr. Voloshen? A. Well, this is in a period of years gone by.

Q. This wouldn't be recently? A. No, sir.

[Q. In other words, not in the last three years? A. No sir.]

Q. You're talking about something that happened maybe ten, fifteen years ago? A. No, I wouldn't say ten, fifteen years ago. I can't remember that far back. I'd say in the past five years, up, I may have made some calls for him in similar cases.

[Q. In other words, over five years ago? A. Yes.]

■ Sweig's major contention on appeal is that the district court erred in denying his motion for acquittal on the perjury counts, because there was insufficient evidence that, when he made his concededly false statements, he subjectively *knew* that those statements were false. The accused's knowledge of the falsity of his statements at the time he made those statements is essential to a perjury conviction under 18 U.S.C. § 1621. United States v. Stone, 429 F.2d 138, 140 (2d Cir. 1970); LaPlaca v. United States, 354 F.2d 56, 58 (1st Cir. 1965), cert. denied, 383 U.S. 927, 86 S. Ct. 932, 15 L.Ed.2d 846 (1966); United States v. Magin, 280 F.2d 74, 76 (7th Cir.), cert. denied, 364 U.S. 914, 81 S.Ct. 271, 5 L.Ed.2d 228 (1960).

Sweig argues that this essential element of knowledge or wilfulness was not proven here. First, he claims, the evidence was insufficient for a jury to find beyond a reasonable doubt that he wilfully perjured himself when he stated that he had never heard of Roth. Rather, according to Sweig, the fact that he dealt with so many names and people in his capacity as administrative assistant to the Speaker and the fact that Roth was involved in what he calls a routine matter preclude a jury's conclusive finding that his statement was wilful or attributable to something other than innocent forgetfulness. Second, Sweig contends, the evidence that he intentionally lied when he testified that he had not made calls for Voloshen in the last three or five years was insufficient, because such calls were routine matters which he had no reason to remember. Moreover, according to Sweig, the clear significance of his grand jury testimony, considered as a whole, is that he *did* make numerous calls for Voloshen within the past five years. The allegedly perjurious answers, Sweig claims, were traps set up by the prosecutor.

■ We reject these contentions. In the absence of an admission by the defendant, the only way a defendant's knowledge of the falsity of his statements can be proved is through circumstantial evidence. American Communications Ass'n., C.I.O. v. Douds, 339 U.S. 382, 411, 70 S.Ct. 674, 94 L.Ed. 925 (1950). The jury must infer the state of a man's mind from the things he says and does. Such an inference may come from proof of the objective falsity itself, from proof of a motive to lie, and from other facts tending to show that the defendant really knew the things he claimed not to know. See United States v. Rao, 394 F.2d 354, 356–357 (2d Cir.), cert. denied, 393 U.S. 845, 89 S.Ct. 129, 21 L.Ed.2d 116, reh. denied, 393 U.S. 972, 89 S.Ct. 390, 21 L.Ed.2d 386 (1968); United States v. Jones, 374 F.2d 414, 419 (2d Cir.), cert. denied, 389 U.S. 835, 88 S.Ct. 40, 19 L.Ed.2d 95 (1967); United States v. Bergman, 354 F.2d 931, 934 (2d Cir. 1966); United States v. Marchisio, 344 F.2d 653, 667 (2d Cir. 1965).[1]

■ In this case, there was sufficient evidence for the jury to infer that Sweig really remembered Roth, when he said he didn't, and that he remembered making calls within the last three or five years, when he said he didn't. The evidence showed that Sweig had at least nine separate conversations, spanning a

---

1. See also Gebhard v. United States, 422 F.2d 281, 287–288 (9th Cir. 1970); La Placa v. United States, *supra*, 354 F.2d at 58–59; United States v. Nicoletti, 310 F.2d 359, 364 (7th Cir. 1962), cert. denied, 372 U.S. 942, 83 S.Ct. 935, 9 L.Ed. 2d 968 (1963); United States v. Beach, 296 F.2d 153, 155 (4th Cir. 1961); and United States v. Magin, *supra*, 280 F.2d at 77–78.

four-month period, with five army officers concerning Roth, and that he handled at least eleven different documents concerning Roth. Some of these conversations and documents indicated Sweig's considerable familiarity with the situation. In addition, just five months prior to testifying, Sweig handled a similar matter concerning Warner; and his comments on that matter at the time indicate that he had a great deal of information about the soldier in question. Moreover, the government showed Sweig's motive to lie, since he was intimately connected with Voloshen's activities in both of these matters—activities which at the time he testified he knew were being investigated. All this was surely enough for the jury to find beyond a reasonable doubt that Sweig wilfully lied when he made the statements charged as perjurious.

Sweig's argument that his statements before the grand jury, viewed as a whole, amounted to an admission, rather than a denial, that he made calls for Voloshen within the past three or five years is simply erroneous. The transcript of Sweig's testimony before the grand jury, quoted above, quite clearly shows the opposite.

■ Sweig's next contention is that the trial court erred in joining the conspiracy count with the perjury counts under Rule 8 of the Federal Rules of Criminal Procedure;[2] and that even if joinder was permitted, the court abused

its discretion in denying Sweig's motion for a severance under Rule 14.[3] The basis for this argument is that certain evidence, including various "hearsay" declarations, which were admissible on the conspiracy count as statements made in furtherance of the conspiracy, were not related in any way to the perjury counts; and since the counts were joined, the evidence may have spilled over in the jury's mind to the perjury allegations, on which it would not have been admissible, and thereby prejudiced Sweig.

The government opposed Sweig's motion for a severance because "proof of the perjury is admissible as false exculpatory statements vis-a-vis the conspiracy and proof of the conspiracy is admissible to show motive and wilfulness with respect to the perjury." Judge Frankel denied the motion on this ground—i. e., that the conspiracy and perjury counts required substantially the same proof.

We agree with the district court's disposition. Sweig's claim for a severance "as of right" under Rule 8 fails because Rule 8(a) permits the joinder of two or more offenses against a single defendant if the offenses are based on "two or more acts or transactions connected together or constituting parts of a common scheme or plan." We believe that Sweig's acts constituting the basis for the conspiracy charges and those constituting the basis for the perjury charges were so connected. Virtually every overt act alleged in the conspiracy count formed the subject matter of one of the

---

2. Rule 8 provides:
   Joinder of Offenses and of Defendants
   (a) *Joinder of Offenses.* Two or more offenses may be charged in the same indictment or information in a separate count for each offense if the offenses charged, whether felonies or misdemeanors or both, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan.
   (b) *Joinder of Defendants.* Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same

series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count.

3. Rule 14 provides in pertinent part:
   Relief From Prejudicial Joinder
   If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires.

eight perjury counts, and would therefore be admissible in a perjury trial to show the falsity of Sweig's denial before the grand jury. Given such a clear case of commonality of proof, the conspiracy and perjury offenses were surely "connected together" for purposes of Rule 8 (a). Baker v. United States, 131 U.S. App.D.C. 7, 401 F.2d 958, 971 (1968); cf. United States v. Kelley, 105 F.2d 912, 916 (2d Cir. 1939).

■ Sweig's pretrial motion for discretionary severance under Rule 14, like his claim of misjoinder under Rule 8(a), was based on the simple proposition that conspiracy and perjury were distinct offenses that should not be tried together. In denying the motion, Judge Frankel noted, "It remains possible, of course, that different things or a different light may appear as the case advances toward or through the trial stage. Accordingly, the denial now of the application for a severance is without prejudice to a renewed application in changed circumstances later on." Despite this expression of the court's willingness to reconsider the question of severance, the defense never raised the issue again. Judge Frankel was therefore never asked to balance the possible prejudice resulting from the admission of the tangential "hearsay" declarations against the relevance of Sweig's participation in a conspiracy to his motive to lie before the grand jury. Hence, in the absence of plain error, this claim is not available on appeal. Rule 30, Fed.R.Crim.P. In the circumstances of this case, we cannot say that denial of the severance motion constituted plain error.[4]

■ Sweig's next contention is that the trial court erred in admitting into evidence without limitation his sworn testimony before the Securities Exchange Commission. On October 14, 1969—the day before his grand jury appearance—Sweig testified falsely before the S.E.C. about his dealings with Voloshen; and a record of that testimony was admitted at trial. Judge Frankel was clearly correct in admitting this testimony, for the propriety of receiving prior false statements to negative a defense of mistake or good faith in a perjury prosecution is beyond doubt. II Wigmore, Evidence (3rd ed.) § 342, p. 246 (1940); Williamson v. United States, 207 U.S. 425, 449–451, 28 S.Ct. 163, 52 L.Ed. 278 (1908). See also United States v. Deaton, 381 F.2d 114, 117 (2d Cir. 1967), and the cases cited therein; United States v. Bradwell, 388 F. 2d 619, 622 (2d Cir.), cert. denied, 393 U.S. 867, 89 S.Ct. 152, 21 L.Ed.2d 135 (1968); United States v. Light, 394 F.2d 908, 912–913 (2d Cir. 1968). Here, evidence of Sweig's false statement to the S.E.C. concerning Voloshen only the day before his grand jury appearance was certainly relevant to the issue of the wilfulness of statements to the grand jury concerning Roth and Warner, regardless of the fact that the subject matter was not identical in all respects.[5]

---

4. For similar reasons we must reject Sweig's claim that it was plain error not to instruct the jury that the "hearsay" declarations were admissible only as to the conspiracy count. Sweig made no request for such an instruction nor did he object to the charge given. Judge Frankel did specifically instruct the jury in his final remarks that it must view the counts in the indictment as "seven separate and distinct charges or alleged crimes," and that to reach a verdict it had to make "seven distinct and separate determinations on each one of the [counts]." In addition, the court explicitly stated that with respect to the Roth perjury count, the jury could not convict unless "the

falsity in fact has been proven to your satisfaction beyond a reasonable doubt."

5. The parties differ as to the status of the S.E.C. testimony, which was admitted in evidence after the defense had rested. Sweig argues that it was rebuttal evidence and as such inadmissible to rebut the evidence presented by the defense's character witnesses, since only testimony of defendant's bad reputation may be admitted to rebut evidence of defendant's good reputation. The government, however, argues that Judge Frankel admitted the S.E.C. testimony not as rebuttal evidence, but as part of the government's case-in-chief, and that as such it was ad-

Sweig argues, too, that Counts Four through Twelve should have been dismissed because of abuse of the grand jury's power in obtaining the perjury indictment. According to Sweig, the government stipulated after trial that at the time he appeared before the grand jury, the grand jury already had sufficient facts to return an indictment on the conspiracy issue, and hence it was improper to call him before the grand jury. The only reason for so calling him, Sweig contends, was to entrap him into committing perjury.

Sweig, however, misinterprets the government's stipulation. In preparation for his post-trial motions, Sweig had moved for a reexamination of the voluminous grand jury material (the "section 3500" material) that had been made available during the trial so that he could develop a basis for arguing that there was sufficient evidence to return an indictment at the time he appeared before the grand jury. In order to accommodate the defense and to avoid the extensive work for all concerned that would have been involved in such an inspection, the government offered to stipulate as to the general nature of the information available to the government at the time of Sweig's grand jury appearance. That stipulation conceded only that there was a basis "for arguing" that there were sufficient factual grounds for the return of a conspiracy indictment at the time of Sweig's appearance. It in no sense conceded that the case had been sufficiently developed at that point to ensure the return of such an indictment. Indeed, the fact that almost three months of grand jury investigation took place between the time of Sweig's appearance and the actual filing of the indictment is persuasive evidence that the government had by no means fully developed its case at the time Sweig testified.[6] Sweig's

missible as relevant to Sweig's knowledge of the falsity of his statements before the grand jury.

The record supports the government's contention. Throughout the trial, Sweig's counsel stated repeatedly that he intended to put the defendant on the stand. At the last minute, however, plans were changed and Sweig did not testify. At that point, the government advised the court that it had been taken by surprise and that it wanted an opportunity to reopen its case in the light of defendant's change in position. One of the items of additional proof it wanted to introduce was Sweig's testimony before the S.E.C. The government stated that if this matter could not be received as rebuttal evidence, then it moved to reopen its case-in-chief so that these additional items of evidence could be considered by the jury. The court specifically asked the government why it had not introduced the S.E.C. testimony during its main case, and the government explained that it had anticipated using the testimony in connection with the cross-examination of the defendant when he took the witness stand.

The court then admitted the evidence stating:

"I am not sure that this all qualifies as rebuttal properly understood but I think the way to handle it is this and I will handle it this way; I will allow the government, considering all the cir-cumstances that have brought us to this situation, to put on these three items of evidence and I think the record could show that I am making this judgment without a close study of the question whether this ought to be viewed as a reopening of the record or rebuttal, because I don't think it makes the least bit of difference to the jury and I think in the end it ought not to make a great deal of difference to us.

"I think the main concern in allowing this is to avoid any prejudice to the defendant. I think the way to handle that is not to exclude evidence, assuming it is otherwise competent, which may help the jury figure out the truth, but to make sure that the defendant has any necessary opportunity to adjust his strategy to this development and to meet it in any suitable way.

"So if that requires some additional time or any other adjustment, we will plan to accommodate that."

The trial court's disposition of this matter was entirely proper; as stated in the text, the S.E.C. testimony seen as part of government's case-in-chief, was certainly admissible as relevant to the issue of Sweig's wilfulness and to his defense of mistake.

6. See United States v. Corallo, 413 F.2d 1306, 1328 (2d Cir.), cert. denied, 396 U.S. 958, 90 S.Ct. 431, 24 L.Ed.2d 422 (1969). In the post-trial argument, the

contention that the real purpose for calling him before the grand jury was to produce a perjury record is pure speculation, unfounded in the facts.

■ In any event, we find no support for a *per se* rule that the grand jury must cease its investigation and desist from calling a possible defendant when it has adduced enough evidence to secure an indictment of that person. It may well develop upon further investigation that others are involved or that those first suspected have explanations or proof which absolve them. Obviously many investigations would be incomplete and superficial if the grand jury failed to call those persons who appear to know the most about matters under inquiry. See United States v. Corallo, 413 F.2d 1306, 1328 (2d Cir.), cert. denied, 396 U.S. 958, 90 S.Ct. 431, 24 L.Ed.2d 422 (1969); United States v. Winter, 348 F.2d 204, 207–208 (2d Cir.), cert. denied, 382 U.S. 955, 86 S.Ct. 429, 15 L.Ed.2d 360 (1965). Indeed, in an investigation

such as the grand jury was conducting here, the grand jury and the government would have been subject to proper criticism if the grand jury had failed to invite Sweig's attendance as a witness. It is altogether in the public interest that grand juries should inquire with care and thoroughness before they file formal charges against anyone. There is no support in the record before us that Sweig was called before the grand jury simply to harass him or to build the foundation for a perjury prosecution. Sweig was fully advised of his rights. Cf. United States v. Scully, 225 F.2d 113 (2d Cir.), cert. denied, 350 U.S. 897, 76 S.Ct. 156, 100 L.Ed. 788 (1955). He appeared and testified. His perjury was clearly established. He has no cause for complaint.

■ Sweig makes several other claims of error which we have examined and find to be wholly without merit.[7]

Affirmed.

government delineated the limited extent of its concession:

"Now, your Honor, with respect to this stipulation that may have loomed larger in the argument than it was intended, you may recall that informally, in chambers the other day, to avoid an unnecessary burdening of this record with extensive arguments about the 3500 material, we were prepared to stipulate that it was an argument that could be made that 23 out of the 85 3500 exhibits came into being prior to the time the defendant appeared before the grand jury.

"I would like the record to be perfectly clear that we don't concede for a minute that that was sufficient to return this indictment at that time and indeed, the fact that so many additional witnesses were called thereafter, I think, is ample proof to the contrary.

"I think the real point that should be made is that what was going on here was an investigation into the misuse of the Speaker's office and what the government was doing at this time was calling the man who was probably in the best position of anyone to provide adequate information * * *."

7. One such contention is that the indictment should have been dismissed because the grand jury received testimony from Speaker McCormack in an unlawful way: Instead of calling McCormack to testify in person, the grand jury sent three Assistant United States Attorneys to interview him on two occasions, once in the presence of his nephew, and then used the transcript of those interviews in returning the indictment. There are very few persons for whom it could have been more difficult and inconvenient to appear before the grand jury in person than the Speaker of the House of Representatives, and hence it was clearly permissible for the grand jury to use the transcript of interviews with him in returning the indictment. United States v. Umans, 368 F.2d 725, 730 (2d Cir. 1966), cert. granted, 386 U.S. 940, 87 S.Ct. 975, 17 L.Ed.2d 872, cert. dismissed, 389 U.S. 80, 88 S.Ct. 253, 19 L.W.2d 255, reh. denied, 389 U.S. 1025, 88 S.Ct. 583, 19 L.Ed.2d 675 (1967). See also United States v. Leibowitz, 420 F.2d 39, 41–42 (2d Cir. 1969), and the cases cited therein.