**Dallas SIMON, Petitioner,**

v.

**Robert H. KUHLMAN, Superintendent, Woodbourne Correctional Facility, Respondent.**

No. 78 Civ. 3781 (WCC).

United States District Court, S.D. New York.

Oct. 25, 1982.

Edward J. Nowak, Monroe County Public Defender, Rochester, N.Y., for petitioner; Thomas A. Klonick, Asst. Public Defender, Rochester, N.Y., of counsel.

Lawrence T. Kurlander, Monroe County Dist. Atty., Rochester, N.Y., for respondent; Melvin Bressler, Rochester, N.Y., of counsel.

OPINION AND ORDER

CONNER, District Judge.

Petitioner Dallas Simon ("Simon") seeks a writ of habeas corpus pursuant to 28

U.S.C. § 2254. Simon originally filed his petition in this Court in 1978 attacking his August 9, 1974 conviction for first-degree robbery, possession of weapons and reckless endangerment in the first degree. In his first submission, Simon claimed (1) that his conviction was obtained as a result of improper identification procedures; and (2) that the jurors at his state court trial improperly considered evidence outside the record by conducting an experiment. This Court, in an Opinion and Order dated November 7, 1979, rejected Simon's first claim. 488 F.Supp. 59. As to the second claim, however, the Court ordered an evidentiary hearing to ascertain the nature and extent of the alleged experiment so that a determination could be made as to whether the alleged experiment amounted to a deprivation of constitutional rights.

At the request of the Monroe County Assistant District Attorney, the hearing was transferred to the Monroe County Court, Rochester, New York, for the convenience of the prospective witnesses. On May 7, 1980, the Honorable Hyman T. Maas conducted the hearing, at which time Simon was represented by the Monroe County public defender.[1] Judge Maas issued his findings of fact on June 23, 1982. The case is currently before the Court for review of Simon's claim in light of that hearing. After reviewing the findings, the hearing transcript, the trial transcript and the submissions of the parties, the Court concludes that the petition must be denied.

## I.

The evidence at Simon's trial can be summarized as follows:[2]

*The State's Case*

### A. The Victim's Testimony

Eve Clements, the proprietor of "Eve's Birdland," a restaurant located at 368 Hudson Avenue, in Rochester, New York, testified that shortly after midnight on the morning of December 28, 1973, she was standing behind the counter in her restaurant, near the cash register, when a man, whom she identified at trial as Simon, came into the restaurant, walked up to where she was standing, pointed a gun at her stomach, and demanded money from her. At the time of the attempted robbery, two customers were seated at the counter directly in front of Mrs. Clements: Sheila Strother, a part-time employee at Eve's Birdland who was not working at the restaurant on that evening, and James Thompson. Mrs. Clements told the robber that her money was in a money bag in a back room of the restaurant. Just as the robber was making his way to the back room to get the money bag, a police officer entered the restaurant. The robber came out of the back room, walked past the police officer and out of the restaurant and the police officer followed him.

Mrs. Clements testified that the lights in the restaurant were on at the time of the attempted robbery; that, in total, the robber was in the restaurant for one and one-half to two minutes; that for much of that time he was only three feet from her and faced her directly; and that he wore a long tan overcoat and a very sheer stocking over his face, through which she was able to see that he had a moustache, a beard and that his hair was in braids. Mrs. Clements testified that she recognized the robber as someone whom she had seen in her restaurant on a prior occasion. When asked whether she had any question in her mind that Simon was the man who attempted to rob her on the night in question, Mrs. Clements said: "No, sir, there is no question about it."

On cross-examination, Mrs. Clements testified that after the attempted robbery, she went down to police headquarters where a police officer asked her to look at several photographs of Black men and thereafter, she was asked to identify a man who was being held in a room at the stationhouse. On redirect examination, she testified that she immediately selected Simon's photograph from the four or five photographs

---

1. Simon filed his habeas petition *pro se.*

2. The evidence was summarized in the Court's prior Opinion and Order and is restated here for the convenience of the reader.

that she was shown and that when she was asked to identify a man seated alone in a room at the police station, she was immediately able to identify him as the man who had attempted to rob her earlier that morning.

B.  Miss Strother's Testimony

Miss Strother testified that the robber was in the restaurant for approximately fifteen minutes; that he wore a brown coat, dark, baggy pants, and a sheer brown stocking over his face, which did not obstruct her view of his facial characteristics, including his moustache, long sideburns, and braided hair.  At trial, she identified a coat which had been recovered by the police near the location of the restaurant as the coat worn by the robber on the night in question; she also identified Simon as the man who attempted to rob Mrs. Clements.

C.  Officer Perry's Testimony

Officer Robert Lee Perry testified that he entered Eve's Birdland shortly after midnight on December 28 to use the telephone and that as he approached the counter a man wearing a very sheer stocking cap and holding a gun in his pocket passed by him.  Officer Perry testified that he and the robber were face to face for fifteen to twenty seconds and that Officer Perry recognized the robber as an individual whom he had seen on eight or nine previous occasions, the most recent being two weeks prior to that morning.  The robber had a moustache and long sideburns and he was wearing a black hat, blue jeans, and a brown knee-length overcoat.

Officer Perry pursued the robber for about ten minutes, during which time the police officer and the robber exchanged gun shots.  Officer Perry testified that from the time the robber left Eve's Birdland to the time he was captured in a house on Putnam Street, the robber was always in the police officer's view with the exception of two occasions.  On the first occasion, Officer Perry lost sight of the man when he climbed over a fence near Cleveland Street, but the police officer ran around to where he thought the man might reappear and observed him removing the brown overcoat.

The stocking cap and the black hat which Officer Perry had seen the man wearing earlier were gone, however.  The man then ran into the backyards between Hudson Avenue and Putnam Street and Officer Perry got into his vehicle and drove around the corner to Putnam Street.  When he left his car and walked down Putnam Street, Officer Perry saw the man walking toward the rear of 4 Putnam Street.  By that time, several additional police officers had arrived and together with Officer Perry they entered the house and found Simon fully clothed and under the covers in a bed in the house.  The police officers found forty-five dollars which belonged to Simon in that bedroom.

Another police officer, Officer Brighton, testified that he found a gun and a brown coat during a search of the area surrounding Eve's Birdland and 4 Putnam Street.

*The Defense*

At trial, Simon testified in his own behalf.  He denied being in Eve's Birdland on the night in question.  He testified that he had been gambling that evening, and that he had become involved in a dispute with one of the other players when a gun went off.  Fearing that he had killed the man he was fighting with, Simon fled the gambling club.  He was passing near Eve's Birdland when he saw a police officer running down the block and, thinking that the officer was seeking him because of the incident at the gambling club, Simon began to run from the officer.  He denied climbing over a fence near Cleveland Street; he testified that he ran directly to the house on Putnam Street, the home of a distant relative, to seek refuge from the police.

Charles Carelock, an acquaintance of Simon's, testified that he was on his way to Eve's Birdland to try and sell Mrs. Clements some stolen merchandise when he saw Simon, with whom he exchanged greetings.  Shortly thereafter, Carelock saw another man come out of Eve's Birdland with a police officer in pursuit.  Carelock began to walk away, and when he turned back and looked down the street to where he had earlier seen the man and the police officer,

he saw that the police officer was now chasing Simon.

*The Deliberations*

After approximately five hours of deliberations, the jury delivered a verdict of guilty. In his habeas petition, Simon alleged that during its deliberations the jury conducted an improper experiment to determine whether it was possible to identify an individual whose face was covered by a stocking. The results of the hearing conducted by Judge Maas, at which eight of the original twelve jurors testified, indicate that the experiment involved the placing of a silk or nylon stocking, belonging to one of the female jurors, over the head of a Black male juror. (Simon also is Black). The jurors conducted the experiment after some of their number questioned whether it was actually possible to identify facial features through a stocking mask. The experiment was conducted in open view of all the jurors and was discussed thereafter by some of the jurors with the conclusion that identification could be made through a stocking mask. Although the experiment took place before the jury reached a unanimous verdict, the precise point at which the experiment occurred during the deliberations could not be determined.

## II.

Simon contends that the jury experiment improperly introduced evidence outside the trial record into the jury's deliberations. He claims that the experiment was especially prejudicial in light of the trial court's refusal to allow him to conduct a similar demonstration during the course of the trial. Outside the jury's presence, Simon requested the judge's permission to place a stocking over his head in order to prove to the jury that it would be impossible to recognize his features through the mask. The judge denied Simon's request on the

ground that it would be inappropriate to use a stocking whose texture and thickness might differ from those of the stocking used in the attempted robbery.

■ Unquestionably, the jury's experiment was improper. The issue to be decided for purposes of habeas relief, however, is not mere impropriety but whether the experiment introduced extra-record facts which give rise to such a probability of prejudice that the jury verdict must be set aside as inherently lacking in due process. *Cf. United States ex rel. Owen v. McMann,* 435 F.2d 813, 819 (2d Cir.1970), *cert. denied,* 402 U.S. 906, 91 S.Ct. 1373, 28 L.Ed.2d 646 (1971), citing *Estes v. Texas,* 381 U.S. 532, 542–43, 85 S.Ct. 1628, 1632–33, 14 L.Ed.2d 543 (1965).

■ Determining the probability of prejudice to a defendant's rights is not a mechanical task. Jurors may not be questioned as to how an experiment affected their votes. See 488 F.Supp. at 68 (citing cases). Rather, the question of whether a probability of prejudice has been created must be resolved by drawing reasonable inferences about the probable effect of the misconduct on an average juror. See *United States v. Howard,* 506 F.2d 865, 869 (5th Cir.1975). As Judge Friendly has noted, "[t]o be sure, there is no 'litmus paper test' for making such a determination." *United States ex rel. Owen v. McMann, supra,* 435 F.2d at 818. In each case, the nature of the extra-record information must be examined in light of the evidence properly before the jury in order to determine the probability of prejudice.

■ Although the Second Circuit has not yet considered the precise issue whether a jury experiment violates due process rights, the court has determined that jurors' consideration of extra-record facts can give rise to a constitutional claim.[3] See *United*

---

**3.** In *Bulger v. McClay,* 575 F.2d 407 (2d Cir.), *cert. denied,* 439 U.S. 915, 99 S.Ct. 290, 58 L.Ed.2d 263 (1978), the Second Circuit most recently considered the effects of juror misconduct on the jury's verdict. *Bulger* involved a habeas petition of a convicted burglar. The main evidence against the petitioner at trial

was the testimony of a woman who witnessed the burglary from her apartment window. This testimony was somewhat discredited, however, by cross-examination which revealed inconsistencies in the witness's various statements. Bulger's defense was that he had been arrested while waiting for a bus on his way to work.

*States ex rel. Owen v. McMann, supra,* 435 F.2d at 818 (jurors' consideration of extra-record facts about defendant's troubled background as related by other jurors denied defendant due process). A review of the case law dealing with juror experiments, however, suggests that where the jurors are not informed of extra-record *facts* but merely observe an experiment in the jury room "testing" certain of the record evidence, their verdict is not constitutionally defective. On the other hand, courts have viewed experiments outside the jury room as infecting the deliberations with such extra-record material that the verdict has been rendered constitutionally invalid. For example, in *United States v. Castello,* 526 F.Supp. 847 (W.D.Tex.1981), a critical issue arose as to whether the victim had been shot in the chest or the back. During a weekend recess, one of the jurors conducted a ballistics experiment and reported his findings to the entire jury when it continued its deliberations on the following Monday. *Id.* at 849. The district court, in granting the defendant's motion for a new trial, concluded that the experiment had been prejudicial, noting that the defense had no opportunity to cross-examine the "testifying juror" who conducted the experiment. *Id.* at 851.

In reaching this conclusion, the court relied on *Durr v. Cook,* 589 F.2d 891 (5th Cir.1979). In *Durr,* the habeas petitioner testified at trial that he had killed the victim in self-defense, claiming that the victim had simultaneously opened the door of a 1973 Ford pickup truck and reached for a rifle in the back of the cab. *Id.* at 892. The jury, however, convicted the petitioner

in spite of this explanation. In his habeas action the petitioner alleged that the jury foreman had conducted an improper experiment by visiting a Ford dealership during the pendency of the trial and making certain twisting motions in the cab of a Ford pickup truck. The petitioner further alleged that the foreman reported the results of his experiments to the other jurors. The Fifth Circuit, holding that the petitioner had stated a substantial claim that his constitutional rights were violated, remanded the matter to the district court for an evidentiary hearing and for a finding as to prejudice.[4]

The instant case, however, presents a situation different from that at issue in either *Castello* or *Durr.* Here, the jury did not seek to discover facts not in the record nor were its deliberations affected by an experiment conducted outside the jury room by a single juror. Both *Castello* and *Durr* involved experiments outside the jury room conducted by one juror who then reported his findings back to the entire jury. Such experiments are clearly prejudicial because there is no way even for the jury to appraise the conditions of the experiment or the validity of the juror's report. More importantly, experiments conducted by one juror outside of the jury room contravene the principle that the jury deliberate as a whole and not consider material available to less than all. The experimenting juror's "report" is inherently incomplete since it would be impossible to detail precisely all the conditions under which the experiment was conducted. Moreover, there is always the possibility that the experimenting juror will mislead the rest of the jury, either

Although Bulger's home address was never made part of the record, the jurors discovered it from a newspaper article and discussed it during the deliberations. Because his home was some distance from the bus stop where he was arrested, Bulger's defense was rendered implausible and at least one juror changed his vote as a result. See *id.* at 409. The Second Circuit affirmed the granting of the writ, ruling that "where specific facts enter the crucible of decision without appropriate safeguards, the constitutional role of the jury is undermined, and the defendant is denied the fair trial which is his constitutional due." *Id.* at 412.

4. The Tenth Circuit in *Gifford v. Warden,* 434 F.2d 318 (10th Cir.1970), reached a similar result. In *Gifford,* the petitioner alleged that a juror went outside the evidence introduced at trial by verifying the time at which a late show ended and by going to a gas station to determine whether it was open at the time mentioned in the testimony. The court remanded the matter for an evidentiary hearing on the ground that the juror's affidavit suggested that the jurors considered facts not emanating from the witness stand. *Id.* at 320–21.

intentionally or unintentionally, as to the results of his experiment.

■ In this case, there was no "testifying juror." Rather, all the jurors saw the experiment and could determine for themselves whether it was consistent with the evidence at trial. The jurors had heard testimony and cross-examination concerning the stocking mask and the identification, and were in a position of being able to evaluate the experiment based on the evidence. Thus, two of the dangers inherent in *Castello* and *Durr*, the "testifying juror" and the introduction of new facts, are not present in the instant case. While these distinctions do not justify the jury experiment in this case, they do affect the evaluation of prejudice. This conclusion is bolstered by decisions of the Fourth and Seventh Circuits, which have held in two cases similar to the instant one that identification experiments in the jury room did not create a sufficient probability of prejudice to require a new trial.

In *Miller v. Harvey*, 566 F.2d 879 (4th Cir.1977), *cert. denied*, 439 U.S. 838, 99 S.Ct. 124, 58 L.Ed.2d 135 (1978), the petitioner sought habeas relief from his conviction for rape on the ground that an improper jury experiment deprived him of due process. The victim testified at trial that she had bitten her assailant on the arm and the state introduced photographs of the petitioner at the time of his arrest which showed bruises on his arm. *Id.* at 880. In

addition, an expert testified for the prosecution that the bruise had been caused by human teeth and not, as the petitioner alleged, by a chain-link fence. During the jury's deliberations, a female juror bit another juror on the arm to see what bruise would result and the jurors observed the bite mark for several hours before returning their verdict of guilty.[5] *Id.* at 881. The Fourth Circuit affirmed the denial of the writ, reasoning that based on the evidence in the record the jury experiment had not "introduced into the jury's deliberations new matter so prejudicial as to deny Miller due process of law." *Id.*[6]

The Seventh Circuit reached a similar conclusion in *United States v. Hephner*, 410 F.2d 930 (7th Cir.1969). In *Hephner* the defendant argued that his bank robbery conviction should be reversed and a new trial granted because the jury conducted an experiment which involved one juror covering his head and putting on sunglasses in a manner similar to that described in testimony concerning the robber. *Id.* at 936. The jurors were trying to determine whether it was possible to identify an individual so disguised. The court rejected the defendant's argument that the experiment was prejudicial, stating:

On the record before us, we cannot say that the simple experiment alleged by defendant was prejudicial or affected the verdict. Jurors must be given enough latitude in their deliberations to permit

---

**5.** The district court did not hold an evidentiary hearing but merely assumed that the facts alleged about the experiment were true. See 566 F.2d at 881.

**6.** The Fourth Circuit distinguished one of its earlier cases, *United States v. Beach*, 296 F.2d 153 (4th Cir.1961), in reaching its conclusion in *Miller*. In *Beach* the court ordered a new trial because of the probability that the jury conducted an experiment. One of the factual issues at the trial concerned the noise of certain adding machines that had been introduced into evidence. After the jury retired, it requested that the court send in an electric drop cord. Although no drop cord had been introduced, the court had one delivered to the jury. Defense counsel, who had been absent from the courtroom when the request was made, immediately objected upon learning that a cord had

been sent in to the jury room on the ground that the jury obviously wanted the cord in order to test the amount of noise made by the running of the adding machines. The Fourth Circuit set aside the conviction because the jury's experiment involved conditions unlike those relevant to the charges in that the jury did not have the padding back on the machines. 296 F.2d at 159–60. In *Miller* the Fourth Circuit characterized *Beach* as resting on the court's supervisory powers over the district courts and not on a rule that jury experiments violate the Sixth Amendment. 566 F.2d at 881. See also *United States v. Welch*, 377 F.Supp. 367, 370 (D.S.C.1973), *aff'd per curiam*, 496 F.2d 861 (4th Cir.1974) (introduction of adhesive tape into jury room with one juror placing tape over lip in order to test identification testimony not reversible error).

them to use common experiences and illustrations in reaching their verdict. In a case, such as here, where there was ample positive identification, as well as circumstantial evidence, the verdict, which is fully supported by the evidence, will not be disturbed on such tenuous grounds. *Id.* at 936.

The factual posture of the instant action appears to this Court to be quite analogous to the situations at issue in *Miller* and *Hephner.* Like the jurors in those cases, the jury here did not conduct an investigation outside the jury room to discover facts beyond the record. Nor did the jury accept an unverifiable report from one of its members concerning the conditions and results of the experiment. Although the jurors here witnessed a demonstration not conducted at trial, they did not go beyond the trial evidence, as in *Bulger* and *Castello,* to bring in extraneous facts. In this case, the jurors heard the testimony, including cross-examination, of three eye witnesses who stated that they saw the robber's facial features through a sheer stocking mask. The identification testimony, however, was not limited to views while the suspect was wearing the stocking mask. In addition, Officer Perry testified that he had recognized Simon both with the mask on and later with the mask off during the pursuit of the robber. While this Court recognizes the possibility that other types of experiments in the jury room could create unknown and substantially prejudicial influences on the deliberations, which would require nullification of the verdict, I cannot conclude that the particular jury experiment involved here created such a probability of prejudice as to amount to a denial of due process.

Simon asserts that because some jurors questioned whether identification could be made through a stocking, there would not have been a conviction if the experiment

had not occurred. In the Court's opinion, Simon's assumption of such a "but for" dependency is unwarranted. Certainly, some jurors questioned the validity of an identification through the stocking mask; the jurors in *Hephner* and *Miller* obviously had similar questions. Yet the testimony at the recent hearing did not reveal any rejection of the testimony by the three identification witnesses at the trial.[7] In fact, there was testimony that the jurors sought to give Simon every benefit of the doubt in conducting the experiment. Moreover, in weighing the probability of prejudice, the Court is not unmindful of the fact that Simon sought to conduct a similar experiment for the jury.

For the reasons stated, the petition for a writ of habeas corpus is denied.

SO ORDERED.

---

7. The testimony at the hearing indicated that some jurors had no question on the identification issue while others thought an experiment would be helpful. Juror Rock, who herself had no question as to identification, did testify, however, that she recalled that one juror "held out" on the identification issue and that was why the jury experiment was conducted. Tr. p. 61. Juror Rock also testified, however, that the jury considered many factors and that no one point appeared determinative of the issue. Tr. p. 52.