**AMWAY CORP., Plaintiff,**

v.

**SHAPIRO EXPRESS CO., INC., et al., Defendants.**

No. 83 Civ. 1655 (RO).

United States District Court, S.D. New York.

June 28, 1984.

Braunstein, Jacobson, Freeman & Viscomi, New York City, for plaintiff; Martin Jacobson, Gary Schultz, New York City, of counsel.

Mitchell N. Kay, New York City, for defendants Shapiro Express Co., Inc. and Michael Shapiro.

Dougherty, Ryan, Mahoney, Pellegrino, Giuffra & Zambito, New York City, for defendant and third-party plaintiff Trans Freight Lines, Inc.; Thomas L. Tisdale, New York City, of counsel.

Haight, Gardner, Poor & Havens, New York City, for defendant J. Bachmann, Inc.; Daniel L. Saxe, New York City, of counsel.

McLaughlin, Simone & Lawlor, New York City, for defendant Bekum Plastics Machinery, Inc.; Michael J. Caulfield, New York City, of counsel.

McHugh, Leonard & O'Conor, New York City, for defendant Maher Terminals, Inc.; James Kenny, New York City, of counsel.

## OPINION AND ORDER

OWEN, District Judge.

This action arises from the alleged destruction of a valuable piece of machinery while in transit from West Germany to Michigan. Each of the various defendants participated in the transportation of the machinery with defendant Michael Shapiro, the object of the instant motion, contracting to transport it from Newark, New Jersey to Ada, Michigan by truck under a bill of lading issued by Shapiro Express Co., Inc. Plaintiff and several of the co-defendants sought certain discovery of Shapiro but, since January of this year, these efforts have been met with a ceaseless pattern of dilatory, obstructive and contemptuous conduct. Having been repeatedly frustrated in all their efforts to take discovery of Shapiro, they are now before me on a motion pursuant to Fed.R.Civ.P. 37 to strike his answer and for other related relief. As discussed hereafter, these admittedly severe sanctions are fully justified by reason of defendant Shapiro's conduct and are granted as to all other parties to the action.

Plaintiff and Shapiro's co-defendants first sought to depose him on January 16, 1984. Shapiro, while represented by counsel in business dealings and other litigation, here chose to appear *pro se*. Despite the recent suggestions of his later-retained counsel that he was bullied at his early depositions, it is obvious from reading the transcripts, and from my personal observations while I presided over certain portions of the depositions, that this claim has no basis in fact. Indeed, it was Shapiro's tactics which succeeded in frustrating the other parties' lawyers from the outset.

■ On the first day of his deposition, the threshold inquiry into the structure of Mr. Shapiro's trucking business, known to plaintiff as Shapiro Express Co., Inc., resulted in perjurious evasions of even the most basic questions:[1]

Q. Starting with the very first business that you had in the trucking field and coming right up to the present time, can you tell me the names under which you have done business during that entire nineteen year period?

---

1. As the Court of Appeals for the Second Circuit has repeatedly held:

In the absence of an admission by the defendant, the only way a defendant's knowledge of the falsity of his statements can be proved is through circumstantial evidence. The jury must infer the state of a man's mind from the things he says and does. Such an inference may come from proof of the objective falsity itself, from proof of a motive to lie, and from other facts tending to show that the defendant really knew the things he claimed not to know.

*U.S. v. Sweig,* 441 F.2d 114, 117 (2d Cir.1971).

A. I don't remember.

Q. Do you remember the very first name that you did business under?

A. I don't remember.

Q. Did it include the name Shapiro in it?

A. I don't remember.

Q. Let's come all the way up to the present time.

Now, as you sit here today, what names do you do business under, as of this date?

A. I personally am unemployed.

Q. You are unemployed. Okay.

For how long have you been unemployed?

A. I don't remember.

Q. Have you collected unemployment insurance?

A. No.

Q. Let's focus on the Far Rockaway office for a moment.

Is there any business being done out of the Far Rockaway office right now?

A. I don't know.

Q. When was the last time you were physically there?

A. I don't remember.

Q. Were you physically there at any time today?

A. I don't remember.

Q. You are sitting here right now.

A. I am trying to protect my own business interests.

MR. JACOBSON: I won't interrupt when you answer. Please don't interrupt me.

Q. Today is a Monday, and it's the 16th of January, and you came here today from some other location. And, as you sit here today you cannot tell me whether or not you were in the office in Far Rockaway today? Is that your testimony?

A. I have to think this one over.

Yes, I could say whether I was in there.

Q. Will you answer the question that I asked before, whether you were in the office today?

A. Yes, I was in the office today.
(Shapiro Deposition, p. 11.)

Faced with this tactic, and apparently trying to highlight it for the Court on a probable future application, counsel pursued the following line:

Q. How did you get here today?

A. I drove a car.

Q. Do you own it?

A. I don't know.

Q. In whose name is the car registered?

A. I don't know.

I will explain that. I own about fourteen, fifteen vehicles and, well, I shouldn't say I own. There are fifteen vehicles available, and I don't know who owns them.

Q. What caused you to use the term "I own fourteen or fifteen vehicles"?

A. Just a slip of the tongue. I'm sorry I used it.

Q. If you don't own them, who does?

A. I don't know.

Q. Are they owned by corporations?

A. Could be.

Q. Do you have the registration to any vehicle with you today?

A. No.

Q. How about the one you drove here?

A. No.

Q. Where is the registration today to that?

A. I don't know.

Q. What did you drive here, what type of vehicle?

A. A Mazda—no, a Lincoln. I think I drove a Lincoln here.

Q. Quite a difference. Was it big or small?

A. I'm not sure which car I drove here.

Q. Let's get to a question I asked you a couple of minutes ago.

Are you aware—and, I am rephrasing it slightly. Maybe it will make it easier. Are you aware of any trucking firms

currently in existence that have the name Shapiro as part of the name of the firm?

A. Yes

Q. Which ones can you think of?

A. Shapiro Express.

Q. Any others?

A. No.

Q. Tell me about your involvement in Shapiro Express.

First, is that a corporation?

A. Yes.

Q. Are you a shareholder of the stock in that corporation? [Shapiro Express Co., Inc.]

A. I don't know.

Q. Do you know who owns the stock in that corporation?

A. No, I don't.

Q. Are you an officer of that corporation?

A. I might be President.

Q. How could you acquire the answers to the questions I just asked? If you wanted to know for yourself.

A. I don't understand the question.

Q. I will make it simple.

If you wanted to know for yourself whether you are a stockholder, whether you are President or some other officer or who the President or other officers are, how would you learn that? What would you do?

A. I don't know. I could probably write to the Secretary of State.

(Shapiro Deposition, p. 14).

After hours of this, counsel decided that a subsequent deposition with some sort of court intervention was required. An order to show cause was prepared which I signed and which was served on Shapiro, returnable April 13th. He failed to appear. Thereupon, following a conference with the other parties, I issued an order for the United States marshals to produce him in Court on April 19. On that date, two marshals went to Mr. Shapiro's home where they were denied admission and told that Mr. Shapiro was in Israel.[2] I extended the order until April 25, when Shapiro, having been telephoned by the marshals, voluntarily appeared before me.

Having shown no cause why he should not be deposed further and why he should not be required to give full and proper answers to the questions posed, I ordered the deposition to continue, and presided over it. Notwithstanding the Court's supervision, the wilful lack of communication continued. At one point the following occurred:

MR. JACOBSON: Your Honor, perhaps an instruction to the witness from the Court about the meaning of testifying under oath at a deposition and the consequences of false testimony might have some value. And perhaps the informal, or less than in-court formality of a trial has caused the witness to think that this is something less than a court proceeding.

THE COURT: Well, I do note here for example that you, Mr. Shapiro, having acknowledged that Mr. Lampert had been bought out in 1969—

THE WITNESS: Yes, your Honor.

THE COURT: —and retired in Florida and had thereafter died in 1977; right?

THE WITNESS: He died around then. I don't know. I wasn't in contact with him for several years, your Honor.

THE COURT: I think you said he died in 1977.

THE WITNESS: I would imagine around there.

THE COURT: All right. When you were asked like at the bottom of page 82, was Lampert involved in Shapiro Express in 1981, and your answer was, I don't think so—

WITNESS: That should have been just a "no," your Honor.

THE COURT: —that should have been a no and that kind of an answer is basically arguable as a false answer. And I observe to you that an answer that indicates a lack of knowledge or an uncertainty about your state of knowledge under circumstances where a reasonable

---

**2.** He had left the United States three days earlier.

man would find it perfectly clear that you ought to have a certainty about your knowledge is equally perjury with an answer knowingly false.

THE WITNESS: Yes, your Honor. That's why I have been trying to tell these gentlemen, they want me to answer questions—

THE COURT: When you say I don't think so about an involvement of Lampert in 1981 when you know he has been dead for four years I observe to you, sir, that is a false answer.

THE WITNESS: I will say then right now that I won't even say that he is dead because I didn't go to the funeral. I can't say anything. But I can't tell you what I don't know for sure.

THE COURT: You know perfectly well what I am talking about. You and I know that Herbert Hoover has died even though we didn't go to his funeral. All right?

THE WITNESS: All right, your Honor. You're right.

THE COURT: So let's not get into those games and let's not have the Court have to deal with anymore of that this afternoon. . . .

(Shapiro deposition p. 274)

Given the inefficiency of the examination without Shapiro's records, I directed him to appear again on May 3 at which time he was to produce certain specific records of his various trucking companies. I directed him to make a list in longhand of what was ordered produced so there would be no question about my instructions. He made such a list.

On May 3 Mr. Shapiro appeared, this time with his counsel of many years Mitchell Kay, but without most of the records he had been directed to bring. His attorney's efforts to explain his client's conduct were patently without merit. It being manifestly clear by this time that Shapiro's intention was to avoid any responsible compliance with the rules of discovery and even court orders, I found Shapiro to be in contempt of my order of April 25 and ordered him incarcerated in the Metropolitan Cor-

rection Center as a civil contemnor until the required records were produced.

On May 4, attorney Kay produced three boxes of documents concerning the various Shapiro trucking concerns, a remarkable improvement over the day before when Kay stated that the few documents that he and Shapiro proffered were "everything we have." (Transcript at 337). Mr. Shapiro was then released with the direction that he continue to be deposed on May 29.

Notwithstanding the foregoing, the events of May 29 provided the quintessential evidence of Shapiro's intent to harass his adversaries and his utter disregard of the oath. Over the several preceding sessions and again on that morning, Shapiro was asked about the premises from which his trucking firms operate. Some of the answers were as follows:

Q. Focusing again for a minute on the Far Rockaway address [1406 Augustine Avenue], is that a building in which you are a tenant or an owner or part owner.

A. Tenant.

Q. Who is the landlord?

A. I don't know.

(January 16, p. 25)

Q. What consideration, if any, do you give for the use of this space.

A. I don't remember.

Q. Are you asking me to believe that someone gives you office space without compensation? Is that what you are saying to me?

A. I am answering your question the best I can.

Q. You are not answering that one. Someone is letting you use space there without compensation?

A. Right.

Q. Do you have any relatives involved in the Augustina address?

A. No.

(January 16, p. 151)

Q. Do you own any other property?

A. No.

(January 16, p. 185)

Q. You mentioned that Shapiro Trucking & Warehouse Corp. has an office at 1406 Augustina Avenue; is that correct?

A. Yes.

Q. What relationship, if any, does Shapiro Trucking & Warehouse Corp. have to 1406 Augustina Avenue?

A. None.

Q. It maintains an office there?

A. Yes.

Q. Does it also maintain warehouse space?

A. Yes.

Q. Does it own that property?

A. No.

Q. Does it lease it?

A. Yes. Well, it pays rent.

Q. Who does it pay rent to?

A. 14–06 Augustina Avenue Corporation.

Q. Do you know who the officers or directors of 14–06 Augustina Avenue Corporation are?

A. No.

Q. Do you know do you personally or does Shapiro Trucking & Warehouse Corp. have any financial interest in the 14–06 Augustina Avenue Corp.?

A. Not that I know of.

(May 29, p. 417)

The falsity of the foregoing answers was thereafter revealed under the following circumstances. On May 29, the day of the last questions quoted immediately above, Shapiro had still failed to produce certain documents which he had been specifically directed on April 25 to obtain. After he had given the above testimony, I ordered him to visit his accountant over the lunch hour to get some of these records, which he did. Among other things disgorged were various corporate tax returns for the years 1977 through 1982 of the 14–06 Augustina Avenue Corporation which revealed Mr. Shapiro to have been a stockholder and officer in 1977, and since then the sole stockholder and sole officer. This was the corporation owning his offices, in which, at various points in his deposition (see *supra*), he had denied holding any ownership interest and denied knowing who the officers were.

At this point plaintiff and two of Mr. Shapiro's co-defendants moved to strike his answer and to pierce the numerous veils of his various shell corporations which he acknowledged "run into each other," including: M. Shapiro Trucking Company, Shapiro-Lampert, Shapiro Express, M. Shapiro Express, M. Shapiro Trucking and Warehouse Corp., and 14–06 Augustina Avenue Corp. I ordered briefing and argument on these issues and, having heard all interested parties, am now entirely convinced that such relief must be granted.

Rule 37(b)(2) of the Federal Rules of Civil Procedure provides that:

If a party ... fails to obey an order to provide or permit discovery, including an order made under subdivision (a) of this rule or Rule 35, or if a party fails to obey an order entered under Rule 26(f), the court in which the action is pending may make such order in regard to the failure as are just, and among others the following:

(A) An order that the matters regarding which the order was made or any other designated facts shall be taken to be established for the purposes of the action in accordance with the claim of the party obtaining the order;

(B) An order refusing to allow the disobedient party to support or oppose designated claims or defenses, or prohibiting him from introducing designated matters in evidence;

(C) An order striking out pleadings or parts thereof, or staying further proceedings until the order is obeyed, or dismissing the action or proceeding or any part thereof, or rendering a judgment by default against the disobedient party.

Here, Mr. Shapiro's conduct goes far beyond disobeying my orders to respond fully to the questions put to him and to produce documents. He has repeatedly

perjured himself and has evinced a continuing and absolute disrespect for the discovery process. While I recognize that striking Mr. Shapiro's answer is quite likely to result in the entry of a default judgment against him and is therefore not to be lightly granted, his insulting disregard for the most basic requirements of honest, responsible litigation leaves me no realistic alternative. He has already been found in contempt of Court and imprisoned to obtain some compliance with one order. That sanction, which is itself one of the most severe available, obviously had little impact for it was followed by a continuing failure to produce documents theretofore ordered, and by rank perjury. As the Court of Appeals for this Circuit has observed:

> The sanction of judgment by default for failure to comply with discovery orders is the most severe sanction which the court may apply, and its use must be tempered by the careful exercise of judicial discretion to assure that its imposition is merited. However, where one party has acted in willful and deliberate disregard of reasonable and necessary court orders and the efficient administration of justice, the application of even so stringent a sanction is fully justified and should not be disturbed.

*Trans World Airlines v. Hughes,* 332 F.2d 602 (2d Cir.1964).

While I have no hesitancy in striking Shapiro's answer, it appears that even this step will be inadequate to provide the parties with the relief to which they are entitled. I therefore also direct that, for all purposes hereafter, the numerous "corporate veils" of the various trucking concerns Shapiro has used in his efforts to evade liability, are to be disregarded. It is clear from his deposition testimony that Mr. Shapiro used a number of corporations over many years to be able, should need arise, to conceal the true ownership and business structure of his operation and thus avoid

liability.[3] As the parties' efforts to unravel the tangled web of companies which seem to "own" Mr. Shapiro's assets have been frustrated by his refusal to cooperate with discovery, an order pursuant to Fed.R. Civ.P. 37(b)(2)(B) precluding him from opposing such a piercing of the corporate veil is appropriate. As provided for in Fed.R. Civ.P. 37(b)(2), costs, including attorney's fees, are also awarded for the proceedings since the initial efforts to depose Mr. Shapiro on January 16.

Submit order on notice accordingly.

**3.** A good example of this is that Shapiro Express Co., Inc., the company that issued the bill of lading in this case—and presumably got paid for its services—was, according to its tax return for that year, an "inactive" corporation with no income. Shapiro Express is apparently but one of four or five trucking corporations under which Shapiro purports to transact business at various times as it suits him.