234

Leroy DAVIS, Plaintiff,

v.

Javier VELEZ, James Lukeson, and
Gary Calhoun, Defendants.

No. 12–CV–1219.

United States District Court,
E.D. New York.

Signed April 23, 2014.

James C. Neville and Michael B. Lumer, Lumer & Neville, New York, NY, for Plaintiff.

Duane G. Blackman and Elissa Beth Jacobs, New York City Law Department, New York, NY, for Defendants.

### MEMORANDUM & ORDER

JACK B. WEINSTEIN, Senior United States District Judge:

| | | |
|---|---|---|
| I. | Introduction | 237 |
| II. | Facts | 237 |
| III. | Trial | 238 |
| | A. Conflicting Stories | 238 |
| | 1. Plaintiff's Account | 238 |
| | 2. Defendants' Account | 239 |
| | B. Discussion | 239 |
| IV. | Pending Post–Trial Motions | 240 |
| V. | Rule 59 Standard | 241 |
| VI. | Extraneous Information Entering Jury Room | 241 |

A. Facts .................................................... 241
 1. Newspaper ........................................... 241
 2. Bags ................................................ 242
 3. Jury Instructions .................................. 242
B. Law ..................................................... 243
C. Application of Law to Facts ............................ 244
 1. Newspaper ........................................... 244
 2. Bags ................................................ 244

VII. Terrel Norman Hearsay Statements ..................... 246
 A. Facts ............................................... 246
 B. Law ................................................. 247
 C. Application of Law to Facts ........................ 247

VIII. Improper Statements During Summation ............... 248
 A. Facts ............................................... 248
 B. Law ................................................. 249
 C. Application of Law to Facts ........................ 249

IX. Discharge of Juror 8 ................................. 250
 A. Facts ............................................... 250
 B. Law ................................................. 251
 C. Application of Law to Facts ........................ 251

X. Plaintiff's Prior Incarceration ....................... 251
 A. Facts ............................................... 251
 B. Law ................................................. 252
 C. Application of Law to Facts ........................ 252

XI. Plaintiff's Prior Convictions ........................ 252
 A. Facts ............................................... 252
 B. Law ................................................. 252
 C. Application of Law to Facts ........................ 252

XII. Conclusion .......................................... 253

## I. Introduction

Defendants Officer Javier Velez, Officer James Lukeson, and Sergeant Gary Calhoun of the New York City Police Department were found liable for false arrest, denial of a fair trial, and malicious prosecution. *See* 42 U.S.C. § 1983. A jury awarded plaintiff Leroy Davis $560,000 in compensatory and punitive damages.

Defendants have filed a series of motions for a new trial. The motions are denied.

## II. Facts

Defendants arrested plaintiff on October 2, 2009. They claimed that one of them saw plaintiff furtively drop a plastic bag on a public sidewalk, heard a metallic clink that sounded like a gun, and found a gun and crack cocaine inside the bag. Based on evidence supplied by defendants, plaintiff was indicted by a federal grand jury. *See United States v. Davis*, E.D.N.Y. No. 09–CR–829. After spending thirteen months in jail awaiting trial, plaintiff was tried on federal gun and drug charges. He was acquitted of all charges. *Id.*, Judgment as to Leroy Davis, Dec. 23, 2010, ECF No. 92.

Plaintiff offered a starkly different account of what happened on the night of October 2. He denied that he possessed or discarded a plastic bag, and claimed that defendants fabricated the evidence against

him—possibly conspiring with an enemy of his named Terrel Norman. Plaintiff's story was that the officers searched the house he shared with several other people *after* he was arrested, hoping to find the gun and drugs planted by Norman.

After three days of trial and three and a half days of deliberations, the jury returned a verdict of "liable" against all three defendants on each of plaintiff's section 1983 claims.

## III. Trial

This is not a case where the weight of evidence supporting the verdict flattens objections like a steamroller. The jury's assessment of the veracity of the parties' stories controlled the jury's decision. The evidence would have supported a verdict for either side. These claimed trial errors that allegedly unfairly nudged victory to plaintiff need to be taken seriously.

### A. Conflicting Stories

Two conflicting stories were presented to the jury concerning the events of October 2, 2009. Plaintiff's version of events was supported by the testimony of plaintiff, three neighbors, and (to some extent) the officers themselves. The defendants offered a conflicting account when they testified on their own behalves.

#### 1. Plaintiff's Account

Except for the three police officers, the witnesses confirmed plaintiff's story.

Plaintiff testified that he and a friend were stopped on October 2, 2009 shortly after they exited plaintiff's abode at 642 Chauncey St. Trial Tr. 447:6–447:19. Plaintiff was on his way to visit his girlfriend next door at 640 Chauncey St. *Id.* He swore that when he was stopped he did not possess a gun or narcotics, Trail Tr. 454:3–454:4, and that he had multiple forms of identification (his Social Security card and his benefit card) on his person, Trial Tr. 462:11. During the stop, one of the officers asked plaintiff where he lived, seized plaintiff's house keys, and went into the front of 642 Chauncey St. Trial Tr. 450:17.

Shakima Jones, plaintiff's friend and neighbor, said she returned to the 600 block of Chauncey St. shortly after plaintiff and his friend were detained. Trial Tr. 157:5–159:19. From the sidewalk directly across the street, Jones saw the two sitting on the ground in handcuffs. Trial Tr. 161:8–161:9. She observed a number of police officers inside 642 Chauncey St. with flashlights reflecting off the walls. Trial Tr. 168:8–168:20; 182:16–182:25. The officers remained on a number of floors inside the residence for 20 to 30 minutes. *Id.*

Vincent Holmes, who lives at 644 Chauncey St., appeared to have no motive to lie. He said he arrived on the scene shortly after plaintiff's detention. Trial Tr. 257:7:257–13. Upon returning from his night shift, he observed plaintiff and another man being detained by police officers. Trial Tr. 257:16–257:21. Holmes testified that as he paused on his front steps, he saw a police officer emerge from 642 Chauncey St. Trial Tr. 359:3–359:12. The officer summoned his colleague, showed him the contents of a box, and then returned to the house. Trial Tr. 259:16–260:10.

Defendant also introduced hearsay evidence suggesting that defendants may have had the assistance of Terrel Norman. Shakima Jones testified that Norman recently confessed that he had planted the gun and drugs inside 642 Chauncey St., and then called "[his] boys," Officers Velez and Calhoun, to notify them. Trial Tr. 176:8–178:11. Clara Jones, Shakima's mother, testified that she had heard Norman threaten plaintiff several months before the arrest: "I'm going to get you.

I'm going to get you." Trial Tr. 108:11–109:4.

### 2. *Defendants' Account*

Defendants maintain that plaintiff was not exiting 642 Chauncey St. when the incident began, but rather that he was walking down the sidewalk of the 600 block of Chauncey St. in the direction of that address. Officer Velez testified that he and the other officers were slowly cruising through the neighborhood in an unmarked patrol car when Velez noticed plaintiff, walking alone in the same direction as the officers' car, drop a plastic bag on the ground. Trial Tr. 295:15–295:19. Velez stated that he heard "some kind of metallic sound" when the bag hit the ground and immediately suspected the bag contained a gun. Trial Tr. 296:3, 298:11–298:17.

Without saying anything to his colleagues, Officer Velez jumped out of the slowly moving car and asked the pedestrian what was in the bag. *Id.* When plaintiff responded "garbage," Velez searched the bag, finding "a firearm with crack cocaine" underneath a box of chicken and soda. Trial Tr. 298:18–299:8. He then "rushed over towards the plaintiff and [he] handcuffed him." Trial Tr. 299:11. Velez had no recollection of Officer Lukeson taking plaintiff's keys and did not see whether any officers entered 642 Chauncey St. Trial Tr. 301:4–301:14.

Lukeson noticed a black plastic bag on the ground after exiting the vehicle behind Velez. Trial Tr. 398:13–398:14. He was never asked if he heard a metallic "clink." According to Lukeson, Velez looked inside of the bag and promptly instructed Lukeson to place plaintiff under arrest. Trial Tr. 398:16–398:23. Only later, after returning to the 83 Precinct, did Lukeson see the alleged contents of the plastic bag. Trial Tr. 403:19–403:20.

Lukeson admitted that, after handcuffing plaintiff, he took plaintiff's keys and entered 642 Chauncey St. without permission. Trial Tr. 381:8–382:4. He concedes that he did not know who the owner of the house was; he lacked a warrant; and there were no emergency circumstances necessitating his immediate entry. *Id.* He explained that plaintiff had no identifying documents on him when he was arrested, and that he entered the house in hopes of finding someone who (a) could identify plaintiff, and (b) supply plaintiff's identification. Trial Tr. 388:6–388:10. The house was "very dark" and Lukeson had never been inside the property. Trial Tr. 386:19–387:12. Lukeson claims he exited within 25 to 30 seconds after knocking on several ground-floor doors. Trial Tr. 386:19–386:23.

Calhoun's testimony largely echoed Lukeson's: he never saw plaintiff carrying a black plastic bag, and he confirmed that Lukeson entered 642 Chauncey St. for only 30 to 35 seconds. Trial Tr. 408:1, 411:13–411:19. Calhoun was not asked if he heard a metallic "clink" before Velez jumped out of the police vehicle. He conceded that he sometimes "exchanged [his] cell phone number with private citizens on the street [*i.e.*, not 'formal informants'] in order to get information." Trial Tr. 409:1.

### B. Discussion

As already noted, the jury would have been justified in finding for either side. Nevertheless, several aspects of defendants' account could have troubled jurors.

Defendants' claim that they entered 642 Chauncey St. in search of plaintiff's identification. Even if plaintiff lacked identification at the time of his arrest, it would be dangerous and likely unconstitutional to enter a dark, unknown private residence—without a warrant or consent—in search of such information. Officers could have been shot by nervous homeowners or at-

tacked by guard dogs. It could have been seen as improbable that Lukeson would undertake this dangerous adventure without informing his partner, Velez, what he was doing. Jurors had reason to doubt Lukeson's explanation for why he entered the home, and to doubt Velez's claim that he had no idea Lukeson had taken plaintiff's keys and was planning to enter plaintiff's house.

Jurors also would have been justified in rejecting defendants' account because they could have concluded that plaintiff *did* possess his identification at the time of his arrest. It is undisputed that plaintiff had his identification later during his incarceration, and defendants gave no explanation of how he obtained it. Defendants concede that no identification documents were retrieved from the house that night. Trial Tr. 386:19–386:23. Calhoun suggested that someone might have come to the 83 Precinct to drop off plaintiff's identification, Trial Tr. 413:22–414:1, but conceded that there was no command log entry documenting that this had occurred, Trial Tr. 418:19–419:14. Defendants' justification for entering the home—and their account of an ensuing 25 to 35 second visit—was subject to doubt.

These testimonial peculiarities may have prompted jurors to attach substantial weight to plaintiff's two eyewitnesses, Shakima Jones and Vincent Holmes. Jones testified that multiple officers rummaged through the house for 20 to 30 minutes. Holmes testified that he saw an officer emerge from the house with a box (plausibly with evidence against plaintiff), summon a fellow officer, and then return to the house with the box. While defendants challenged Jones' credibility by underscoring her close relationship with plaintiff, Holmes had no apparent motive to lie. He provided testimony that might have been deemed compelling and damaging to defendants' account. He appeared to be a reluctant witness. He testified under subpoena and had minimal prior contact with attorneys.

Defendants' claimed justification for detaining plaintiff could be seen as shaky. Velez testified that he observed plaintiff dropping a plastic bag and heard a metallic "clink" when the plastic bag hit the ground. Neither Lukeson nor Calhoun, riding in the same car, corroborated this testimony. Defendants failed to introduce the plastic bag or its contents into evidence. Additionally, it might have been seen as unlikely that Velez would jump from a moving vehicle to verbally accost plaintiff without explaining to his partners what he had observed.

It is possible that jurors were swayed by plaintiff's hearsay evidence concerning Terrel Norman. This evidence was not necessary for the jury's verdict: jurors could have concluded that defendants discovered the gun and drugs in someone else's room in 642 Chauncey St., or that defendants planted the evidence once their possible fishing expedition failed to yield any contraband. But Norman's purported confession does provide an alternative explanation for defendants' behavior after the initial stop. Defendants' failure to depose Norman was a strategic error. The trial was set with sufficient time for defendants to unravel the Norman threads.

## IV. Pending Post–Trial Motions

On February 6, 2014, defendants filed a motion for a new trial pursuant to Federal Rule of Civil Procedure 59. ECF No. 98. It identifies two types of extraneous materials brought into the jury room that allegedly tainted deliberations: (1) a copy of the Wall Street Journal containing an article suggesting that a Nassau County police official was corrupt, and (2) two bags alleg-

edly used to test aspects of defendants' story.

On February 18, 2014, defendants filed a second motion for a new trial under Federal Rule of Civil Procedure 59. ECF No. 100. This motion advances five more grounds for a new trial: (1) the court improperly admitted hearsay statements by Terrel Normal; (2) plaintiff's counsel made improper statements during summation; (3) the court should have declared a mistrial when one juror reported that he was too ill to continue deliberating; (4) the court improperly limited evidence of plaintiff's prior incarceration, which was relevant for damages purposes; and (5) the court improperly limited evidence of plaintiff's prior convictions, which should have been admissible pursuant to Federal Rule of Evidence 609.

An evidentiary hearing was conducted on March 10, 2014. Testimony germane to defendants' motions was taken from three jurors and an attorney representing Terrel Norman.

On April 1, 2014, defendants filed a third motion for a new trial under Federal Rules of Civil Procedure 59 and 60. ECF No. 115. The third motion relies upon evidence adduced during the March 10, 2014 hearing, but does not identify any new grounds for relief.

## V. Rule 59 Standard

■■■ "[F]or a district court to order a new trial under Rule 59(a), it must conclude that 'the jury has reached a seriously erroneous result or . . . the verdict is a miscarriage of justice.'" *Manley v. AmBase Corp.*, 337 F.3d 237, 245 (2d Cir.2003) (quoting *Song v. Ives Labs., Inc.*, 957 F.2d 1041, 1047 (2d Cir.1992)). A jury's verdict "should rarely be disturbed." *Farrior v. Waterford Bd. of Educ.*, 277 F.3d 633, 635 (2d Cir.2002).

## VI. Extraneous Information Entering Jury Room

### A. Facts

#### 1. Newspaper

At the March 10 evidentiary hearing, Juror 7 testified that Juror 9 brought into the jury room a newspaper article about a "dirty cop on Long Island." Hr'g Tr. 10:23–11:1. According to Juror 7, "it was never shown to the [other] jurors because [Juror 7] stopped it from being shown, because it was irrelevant to the case." *Id.; see also* Hr'g Tr. 11:11–11:12 ("But like I said, I stopped the person from presenting it because he was waving it."). Juror 7 stated that Juror 9 referred to the article as an example of police corruption, emphasizing "if this cop could be dirty, [the defendants] could be dirty." *Id.* at 11:24–11:25. Juror 7 could not remember any specifics of the article or recall which newspaper published it. Hr'g Tr. 10:22–12:3.

Juror 9 confirmed that it was his "normal habit" to bring the Wall Street Journal to court with him. Hr'g Tr. 30:20–30:21, 40:10–40:11. He recalls that one day during deliberations the newspaper contained an article about police misconduct, but he could not recall the article's specific contents. Hr'g Tr. 30:22–31:6, 32:16–32:22. He credibly testified that he brought the newspaper to court with no purpose of influencing fellow jurors through its contents. Hr'g Tr. 31:2–32:3. He stated with confidence that he brought the article to court on Friday, December 13, 2013—the date it appeared in print—and not on some later date. Hr'g Tr. 34:35–35:19.

Contradicting Juror 9's testimony as to dates, Daniel Oliner, an attorney from the Office of the Corporation Counsel, testified that he interviewed Juror 9 immediately after deliberations concluded. Hr'g Tr.

60:2–61:4. He testified that Juror 9 indicated that he brought in the article from "last week's papers" to show the other jurors that "not all cops were good, essentially." Hr'g Tr. 61:14–61:18. The attorney's testimony suggests Juror 9 had the disputed article with him at the time of their interview, Tuesday, December 17. *But see* Hr'g Tr. 61:19–61:25 (Oliner did not "see the title of the newspaper [Juror 9 was then holding] or . . . read the article or anything [of] that nature."),

The December 13, 2013 edition of the Wall Street Journal carried a story, on page A21, entitled, "Nassau Chief Is Out After Investigation." Defs. Ex 1, Mar. 21, 2014 Hr'g. The article details the resignation of Nassau County police commissioner Thomas Dale, who was accused of ordering the arrest of a man for outstanding court fines at the behest of a political donor. *Id.* The alleged wrongdoing did not involve fabrication of evidence, false testimony, or other misconduct by defendants or New York City Police Department officers. *Id.*

To the extent there is a conflict between the testimony of Juror 9 and City attorney Oliner, Juror 9's version of the events is credited. The newspaper was brought into the jury room only on Friday, December 13, and Juror 9 harbored no improper motive in carrying it into the jury room.

### 2. Bags

Juror 7 testified that she brought "a larger bag, black bag, like the kind that holds two bottles of wine" into the jury room. Hr'g Tr. 14:1–14:2. Her purpose, she explains, was to rebut the argument advanced by some fellow jurors that a gun, crack cocaine, a box of chicken, and a soda could not fit inside the same bag. Hr'g Tr. 13:23–14:1. The defendants claimed that these items were found in the bag plaintiff dropped.

Jurors also conducted an experiment involving a separate bag during delibera-

tions. Jurors 7 and 9 testified that Juror 8 brought in a plastic bag with "stuff in [it]" that he dropped in an effort "to prove that the police officers were telling the truth." Hr'g Tr. 15:17; 17:12–17:16; 25:22–25:23; 38:7–38:18. Juror 7 recalled that "[Juror 8] might have went to the bathroom area" of the jury room, which is covered in hard tile rather than carpet, to drop the bag. Hr'g Tr. 17:12–17:16. Juror 8 could not recall whether this occurred. Hr'g Tr. 72:15.

The following day, Juror 7 "brought in a can of Progresso soup, so [Juror 8] would see that—he would see it could have been anything in the bag that hit the ground." Hr'g Tr. 16:9–16:11. No further experiments occurred because Juror 8 did not return for the final day of deliberations. Hr'g Tr. 16:13. When asked if the purpose of bringing the soup "would be to simulate the sound of a gun hitting the ground," Juror 7 clarified that it was to demonstrate that "it could have been anything in the bag. . . . Because at that point, it was a—it was trying to turn [Juror 8], I guess." Hr'g Tr. 16:14–16:19.

The accounts of Jurors 7 and 9 are credited: the "experiment" was conducted and all the jurors were aware of it.

### 3. Jury Instructions

After the first day of testimony, jurors were admonished not to conduct any personal research related to the case. Trial Tr. 222:5–222:8 ("All right. We will break now. Be here at 10:00 o'clock, would you please? Don't discuss the case and don't do any research of your own. Leave your notebooks here, please."). When orally charged, they were similarly instructed, "You are not to do any research of your own." Trial Tr. 501:4–501:5.

Both the written and oral instructions, a copy of which was provided to each juror, made clear that the jurors were to "[d]e-

cide the case solely on the evidence, or lack of evidence, before you, and according to the law." Trial Tr. 487:13–487:15; Final Jury Charge, Ct. Ex. 1, Dec. 12, 2013.

Neither party requested additional instructions regarding juror experiments, the meaning of "evidence," or the bringing of personal effects into the juror room.

### B. Law

■ "[A] complete sanitizing of the jury room" is neither possible nor desirable. *U.S. ex rel. Owen v. McMann*, 435 F.2d 813, 818 (2d Cir.1970). "[T]he subjective opinions of jurors, their additudinal [sic] expositions, [ ]their philosophies" and their life experiences are "the very human elements that constitute one of the strengths of our jury system, and we cannot and should not excommunicate them from jury deliberations." *Id.; accord Bibbins v. Dalsheim*, 21 F.3d 13, 17 (2d Cir.1994) ("[T]he life of this community is part of the fund of ordinary experience that jurors may bring to the jury room and may rely upon, in the same way that another juror may know that Times Square is busy all night or that there are doormen along stretches of Park Avenue.").

■ Extra-record information that comes to the attention of a juror is presumptively prejudicial. *See United States v. Hillard*, 701 F.2d 1052, 1064 (2d Cir. 1983). This presumption may be rebutted by an affirmative showing that the information was harmless. *Id.* "The touchstone of decision in ... case[s] [involving juror contamination] is thus not the mere fact of infiltration of some molecules of extra-record matter, ... but the nature of what has been infiltrated and the probability of prejudice." *United States v. Weiss*, 752 F.2d 777, 782–83 (2d Cir.1985) (quoting *United States ex rel. Owen v. McMann*, 435 F.2d 813, 818 (2d Cir.1970)). The trial court should "assess the 'possibility of prejudice'

by reviewing the entire record, analyzing the substance of the extrinsic evidence, and comparing it to that information of which the jurors were properly aware." *Id.* at 783 (quoting *Sher v. Stoughton*, 666 F.2d 791, 794 (2d Cir.1981)).

Juror *experiments* pose somewhat different legal and factual problems than the contamination of the jury room by non-evidentiary *information* (*e.g.*, newspapers, demonstrative exhibits, charts discussing damages). *See generally Baugh v. Cuprum S.A. de C.V.*, 730 F.3d 701 (7th Cir. 2013) (discussing problems unique to demonstrative exhibits). Typically, such experiments occur outside of the courthouse, as when a juror attempts to recreate or test evidence adduced at trial. *See, e.g., Durr v. Cook*, 589 F.2d 891 (5th Cir.1979) (discussing out-of-court experiments by jurors). Particularly unusual are cases like the present one in which jurors bring non-record materials into the jury room to conduct experiments before all deliberating jurors. *Simon v. Kuhlman*, 549 F.Supp. 1202, 1206 (S.D.N.Y.1982) (distinguishing outside-the-jury-room and inside-the-jury-room experiments).

■ In this case, the soundest way to consider the jurors' jury-room experiments (and the approach urged by defendants) is to assess the experiments as the court would view extra-record information improperly before the jury: the experiments are presumptively prejudicial, but this presumption may be rebutted by an affirmative showing that the information gleaned from the experiments was harmless. In assessing the possibility of prejudice, the court must analyze the demonstrated or likely results of the experiment, and compare those results with the information of which the jurors were properly aware. *Cf. Weiss*, 752 F.2d at 782–83. Relevant considerations include whether "all the jurors saw the experiment[;] could determine for

themselves whether it was consistent with the evidence at trial[;] and were in a position of being able to evaluate the experiment based on the evidence." *Simon,* 549 F.Supp. at 1207.

## C. Application of Law to Facts

### 1. Newspaper

■ The introduction of the December 13, 2013 edition of the Wall Street Journal into the jury room did not render the verdict a "miscarriage of justice," *Manley,* 337 F.3d at 245, and did not taint deliberations with "prejudicial" extra-record information, *Hillard,* 701 F.2d at 1064.

The uncontradicted evidence establishes that jurors were *not* exposed to the extrinsic information contained in the article. Juror 7 credibly testified that she halted any discussion of the article and properly pointed out that its content was irrelevant to the case at hand. Hr'g Tr. 10:23–11:1. Juror 9's general remarks about police officers did not impermissibly taint the deliberation process. *See U.S. ex rel. Owen v. McMann,* 435 F.2d 813, 817–18 (2d Cir.1970) (Friendly, J.) ("[W]e suspect there are many cases where jurors make statements concerning the general credibility or incredibility of the police, the need of backing them up even when there is reasonable doubt of guilt or putting brakes upon them even when there is none .... and concerning other matters that would invalidate a judgment if uttered by a judge. Yet this is the very stuff of the jury system.").

Even if the article had been deliberately circulated and carefully reviewed by jurors, it contained no facts or information related to the instant case. *Compare Mattox v. United States,* 146 U.S. 140, 13 S.Ct. 50, 36 L.Ed. 917 (1892) (ordering new trial where deliberating jurors read newspaper account of criminal case at issue). At most, attentively reading the article would

have reminded jurors of the possibility that police commissioners sometimes engage in official wrongdoing. Daily newspapers frequently contain such accounts, just as they feature stories that are favorable to police commissioners. *See, e.g.,* Sean Gardiner, *Kelly Recounts Successes, Criticism,* WALL ST. J., Dec. 12, 2013, at A21.

In assessing the "possibility of prejudice," the disputed information must be compared to information of which the jurors were properly aware. *Weiss,* 752 F.2d at 783. So prevalent are stories of police corruption that any informed Brooklyn juror is aware of the possibility of police misconduct, with or without the article's introduction into the jury room.

### 2. Bags

It is unclear whether there is in any competent evidence upon which defendants' bag-related Rule 59 motion may be based. Federal Rule of Evidence 606 prohibits testimony "about any ... incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment." Fed.R.Evid. 606(1). A juror may testify about "extraneous prejudicial information" or whether "an outside influence was improperly brought to bear on any juror," *see* Fed R. Evid. 606(2)(A),(B), but the presence of two bags in the jury room does not appear to satisfy either of these criteria.

■ For the purpose of this case it is assumed that the jurors are competent to give evidence about the presence of the two bags. The matter has been revealed and should be dealt with.

The issue was not sufficient to generate "a seriously erroneous result or ... [to produce] a miscarriage of justice." *Man-*

*ley,* 337 F.3d at 245. Neither demonstration prejudiced the defendants.

According to Juror 7, the first bag was brought in to demonstrate that a box of chicken, a soda, a gun, and crack cocaine could fit within a single bag, as defendants claimed. It can be safely assumed, since Juror 7 selected a "larger bag," that her bag could contain these items. Hr'g Tr. 14:1–14:2. Jurors could have drawn one of two conclusions from this demonstration: (1) that it was more likely that the defendants were telling the truth because it was possible for these items to fit inside a bag, or (2) that Juror 7's experiment was irrelevant, because Juror 7's larger bag might be different from the bag allegedly carried by the plaintiff on October 2, 2009. If jurors drew the former conclusion, defendants benefited from—and, hence, were not prejudiced by—this fatuous check-out counter demonstration; if jurors drew the latter conclusion, they properly disregarded the extrinsic materials.

■ The second experiment, conducted by Juror 8, was similarly inconsequential. Juror 8 was hoping to demonstrate a point favorable to defendants—that it was possible for Velez to hear the "metallic sound" he claimed—but defendants have offered no direct evidence of how the experiment was carried out (*i.e.,* what the contents of the bag were, on what surface the bag was dropped) and what the results were (*i.e.,* what type of noise was generated). The experiment might have unwittingly benefitted plaintiff. The unrebutted evidence, however, establishes just the opposite: Juror 7's decision to bring in a metallic object the following day prove *to Juror 8* that "it could have been anything in the bag" signals that Juror 8's bag made a sound consistent with Velez's testimony. Hr'g Tr. 16:14–16:19. Otherwise, there would have been no point in Juror 7 bringing in an innocuous metallic object to dem-

onstrate her point. Defendants either benefitted from the improper experiment, or the demonstration had no effect on the jurors.

Even if the results were otherwise, the "experiment" of dropping a bag with "stuff in [it]" would not generate any information or data that would be novel for an average juror. A juror can be expected to infer the sound, or range of sounds, a dropped bag with diverse contents might make upon hitting the ground from years of living.

*Simon v. Kuhlman,* a habeas challenge to a criminal conviction purportedly tainted by juror experiments with non-record evidence, presented a similar problem. 549 F.Supp. 1202 (S.D.N.Y.1982). There, petitioner was convicted of a first-degree robbery perpetrated by a man wearing a sheer stocking over his face. 549 F.Supp. at 1203. Multiple witnesses identified the petitioner as the robber. *Id.* at 1203–1204. While deliberating, jurors placed a silk or nylon stocking belonging to one of the female jurors over the head of a Black male juror (the petitioner was also Black), in an effort to determine "whether it was actually possible to identify facial features through a stocking mask." *Id.* at 1205. The court determined that "the jury's experiment was improper," but nevertheless denied relief, explaining that there was insufficient risk of prejudice from the experiment:

> [A]ll the jurors saw the experiment and could determine for themselves whether it was consistent with the evidence at trial. The jurors had heard testimony and cross-examination concerning the stocking mask and the identification, and were in a position of being able to evaluate the experiment based on the evidence.

*Id.* at 1207. *See also Miller v. Harvey,* 566 F.2d 879 (4th Cir.1977), *cert. denied,*

439 U.S. 838, 99 S.Ct. 124, 58 L.Ed.2d 135 (1978) (denying habeas relief where juror bit another juror on the arm to see what bruise would result and the jurors observed the bite mark for several hours before returning their verdict of guilty); *United States v. Hephner*, 410 F.2d 930 (7th Cir.1969) (upholding conviction where "jury conducted an experiment in the jury room by having [a] juror cover his head and put on sunglasses, in a manner similar to that alluded to in testimony," because "[j]urors must be given enough latitude in their deliberations to permit them to use common experiences and illustrations in reaching their verdict.").

While defendants cannot be blamed for the jury's decision to disregard the court's clear instructions not to conduct independent research, these experiments were attributable to the defendants' failure to introduce into evidence the actual bag and contents they allege plaintiff was carrying at the time of his arrest. Officer Velez's testimony (uncorroborated by his co-defendants) that, from inside a passing vehicle, he heard a metallic sound was likely to trigger skepticism among some jurors. It was critical for defendants to demonstrate that Velez's account was plausible. The jurors' attempts at satisfying their curiosity—left unsatisfied by the conspicuous failure of defense counsel to anticipate the issue—do not render the ultimate verdict a miscarriage of justice.

## VII. Terrel Norman Hearsay Statements

### A. Facts

During his criminal trial, plaintiff made use of hearsay statements by Terrel Norman—introduced through witness Shakima Jones—indicating that Norman planted critical evidence used against the plaintiff. Plaintiff disclosed Norman as a potential witness in the civil case in late June 2012.

Neither plaintiff nor defendant sought to depose Norman during discovery.

In November 2013, defendants moved *in limine* to exclude any evidence regarding Terrel Norman as "irrelevant, speculative, unduly prejudicial, and inadmissible hearsay." ECF No. 63, *12. At around the same time, it was learned that Norman was in North Carolina county jail facing charges of illegally possessing a handgun and marijuana.

On December 3, 2012, a hearing was conducted with Norman's criminal counsel, Paris Branch–Ramadan, appearing by telephone. Branch–Ramadan was familiar with plaintiff's pending civil suit, but had not yet discussed the matter with her client. Hr'g Tr. (Dec. 3, 2013) 12:19–12:24. She confirmed that she would "advise [Norman] . . . to plead his constitutional rights not to incriminate himself" if asked to testify. Hr'g Tr. (Dec. 3, 2013) 13:5–13:7. She further provided her assurance that she would speak with Norman soon and would contact the court if Norman indicated he would disregard her advice and *not* assert his privilege in the pending civil case. Hr'g Tr. (Dec. 3, 2013) 13:9–13:20. The court then clarified: "I'm not asking you [Mrs. Branch–Ramadan] to call me or not to call me, but I just told you what the effect of you not calling me will be. Do you understand[?]" Branch–Ramadan answered, "I understand clearly, Judge." Hr'g Tr. (Dec. 3, 2013) 14:11–14:15.

The parties were asked if "anybody objects to the action the court has just taken." Hr'g Tr. (Dec. 3, 2013) 14:20–14:23. Both plaintiff and defendants responded that they did not object. *Id.*

Defendants declined the opportunity to call Norman as a defense witness or take his deposition. Hr'g Tr. (Dec. 3, 2013) 7:21–7:25 (THE COURT: "Do you want to

call him as your witness?" [DEFENDANTS' COUNSEL]: "As my witness at this point, no, Your Honor." THE COURT: "So you don't want him. You don't want a deposition, you don't want to take a video, that's clear. Tactically that's clear, you don't want him around.").

Branch–Ramadan did not contact the court before trial.

At trial, plaintiff argued that defendants conspired with Terrel Norman to frame him. Plaintiff introduced hearsay statements, purportedly made by declarant Norman to witness Shakima Jones, that Norman planted evidence and communicated with Sergeant Calhoun the night of Norman's arrest.

At defendants' request, Branch–Ramadan testified at the March 10 evidentiary hearing. She confirmed that she spoke with Norman before the civil trial, and that Norman said he "absolutely . . . would" follow her advice and plead the Fifth Amendment if called to testify. Hr'g Tr. 44:5–44:16.

### B. Law

Hearsay statements generally are inadmissible. *See* Fed.R.Evid. 802.

Several exemptions to the rule against hearsay apply where "[a] declarant is considered to be unavailable as a witness." Fed.R.Evid. 804(a). A declarant is "unavailable" within the meaning of Rule 804 if the declarant "is exempted from testifying about the subject matter of the declarant's statement because the court rules that a privilege applies." Fed.R.Evid. 804(a)(1).

"Statements against interest" are not excluded by the rule against hearsay if the declarant is unavailable as a witness. Fed. R.Evid. 804(b)(3). A statement against interest is one that "a reasonable person in the declarant's position would have made

only if the person believed it to be true because, when made, it was so contrary to the declarant's proprietary or pecuniary interest or had so great a tendency . . . to expose the declarant to civil or criminal liability." Fed.R.Evid. 804(b)(3)(A).

A witness need not be haled into court to be declared "unavailable" for purposes of Rule 804. *United States v. Williams*, 927 F.2d 95, 99 (2d Cir.1991) ("[Rule 804](a)(1) . . . identifies as 'unavailable' a witness who is exempted by a court ruling on the ground of privilege. Such a ruling can be made, as in the instant case, with or without the witness being haled into court.").

### C. Application of Law to Facts

■ Norman's hearsay statements were properly admitted as statements against interest. Defendants do not suggest that Norman's admission that he planted a gun and drugs were not "statements against interest"; rather, they dispute whether he was truly "unavailable" at the time of trial.

He was "unavailable" for purposes of the trial because the court ruled his Fifth Amendment privilege exempted him from testifying about the subject matter of his hearsay statements. *See* Fed.R.Evid. 804(a)(1); *United States v. Dolah*, 245 F.3d 98, 102 (2d Cir.2001), *abrogated on other grounds by Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) ("It is settled in this Circuit that a witness who invokes the privilege against self-incrimination is 'unavailable' within the meaning of Rule 804(b) even though the Government has the power to displace the witness's privilege with a grant of use immunity.").

The prospective witness invoked his privilege through his attorney. The absence of follow-up communication from

Branch–Ramadan after the December 3 hearing, coupled with Branch–Ramadan's earlier assurance that she would contact the court if Norman indicated he would testify, was sufficient to constitute an assertion of privilege. *See United States v. Muyet*, 958 F.Supp. 136, 138 (S.D.N.Y. 1997) ("[A] declarant, whose attorney represents that the declarant will assert his privilege against self-incrimination if called to testify, is unavailable for purposes of Rule 804(b)(3).") (citing *Williams*, 927 F.2d at 99).

Defendants cite a series of criminal cases—none of which involve Rule 804—in which the Court of Appeals for the Second Circuit has held that "[a] district court should not accept a witness' blanket assertion of the Fifth Amendment privilege in response to any and all questions asked of her." *United States v. Rodriguez*, 706 F.2d 31, 37 (2d Cir.1983). Rule 804 contemplates a more flexible approach to the admission of hearsay statements by an unavailable declarant. It allows the court to deem a declarant "unavailable" if the declarant "is exempted from testifying about *the subject matter of the declarant's [hearsay] statements* because the court rules that a privilege applies." Fed. R.Evid. 804(a)(1) (emphasis added). Here, it is plain that the privilege against self-incrimination would apply to the general subject matter of Norman's purported confession that he planted key evidence that led to plaintiff's arrest.

Forcing Norman to personally appear in federal court in Brooklyn to invoke his Fifth Amendment rights, or imposing upon North Carolina officials to establish a reliable video connection, would have been a needlessly burdensome exercise in light of his counsel's assurances.

 To the extent the court erred in failing to obtain better assurances of Norman's "unavailability" before admitting his statements, the error was harmless. Branch–Ramadan's subsequent testimony, which the court credits, establishes that Norman personally and unequivocally asserted his Fifth Amendment rights before trial. Further inquiry before trial would have reconfirmed what was already known: that Norman was unavailable because he invoked his privilege.

## VIII. Improper Statements During Plaintiffs Summation

### A. Facts

Plaintiff's counsel made the following statements over the course of a much longer closing argument:

> You know, you heard evidence that I was Mr. Davis's criminal defense attorney. I have been with this case a long time.... Ladies and gentlemen, I admire, and I think you should too, the courage of my little band of witnesses, of busybodies, of concerned citizens who had the courage to come into court, more than once, to testify against these three defendants. No easy task....
>
> I go back to Vincent Holmes. Please convince me, why should Vincent Holmes have made that story up? Why would he lie? The man was like a frisky, I don't know what. I couldn't get a hold of him. [MS. JACOBS: "Objection."] I had to give him a subpoena. The man did not want to come to court. He's come to court now three times, prior proceedings and then this one. And it's always is Sonny going to make it? Where's Sonny? [MS. JACOBS: "Objection, Your Honor." THE COURT: "I'll allow it."] Ladies and gentlemen, I went to Bushwick and picked him up that morning and brought him to court. [MR. BLACKMAN: "Objection; Counsel is inserting himself."]

THE COURT: "Sustained. Strike that."] . . . .

Now, I am proud to put Shakima Jones on the witness stand, Clara Jones on the witness stand, Sonny Holmes on the witness stand because those are the people of the neighborhood, those are the real people. They are who they are. But they told the truth and maybe part of the reason why somebody like Shakima Jones came in with the courage that she has, because she said it on the witness stand, these cops stop us all the time. [MR. BLACKMAN: "Objection, Your Honor." MR. NEVILLE: "She said it on the witness stand." THE COURT: "I'll allow it. Go ahead."] . . . .

I think Sonny Holmes and the property receipt were what? I think those are the key pieces of evidence here. I, myself have trouble believing this whole thing. [MR. BLACKMAN: "Objection; Counsel is personalizing the argument." THE COURT: "Try not to personalize."] . . . .

On rebuttal, plaintiff's counsel made the following statement:

If Clara Jones, Shakima Jones, Sonny Holmes, were making this story up, wouldn't they have done a better job? Wouldn't I have influenced them better? Give me more credit than that. I didn't influence these people. I resent that. You know, just trying to seek the truth [MR. BLACKMAN: "Objection, Your Honor."] and investigate [THE COURT: "Overruled."] and talk to people and go to the neighborhood and find out what really happened and coax people from the corners who were witnesses, to have them come to court. That's carefully crafting a story? That's seeking and finding the truth.

Defendants did not move for a mistrial after closing statements or seek additional curative jury instructions.

The jury was instructed before summations that they would:

hear the summations. This is not evidence, but it is an important part of the case, because the attorneys will try to analyze the evidence to help you in your deliberations. Since it's not evidence, it will not be sent in to the jury room. You can take notes, of course. But all of the evidence, as I told you, will be available.

Trial Tr. 573:21–574:2. The final jury charge, which jurors received the following day in writing, instructed the jury that "[a] lawyer's questions without an answer, arguments, and opening and closing statements are not evidence." Final Jury Charge, Ct. Ex. 1, Dec. 12, 2013.

### B. Law

■ Improper remarks by counsel during summation may be grounds for a new trial. *Tesser v. Bd. of Educ. of City Sch. Dist. of City of New York*, 370 F.3d 314, 321 (2d Cir.2004). It is "well established" that it "is improper for attorneys to place their own credibility in issue or vouch for their clients or witnesses during summations." *Marcoux v. Farm Serv. & Supplies, Inc.*, 290 F.Supp.2d 457, 467 (S.D.N.Y.2003).

■ The remarks must "cause prejudice" and "unfairly influence [the] verdict" to warrant a new trial. *Tesser*, 370 F.3d at 321. In weighing the potential prejudice, improper comments by counsel must be viewed within "the context of the entire trial and judge's instruction [if any] that statements made by the lawyers were not to be considered as evidence." *Id.* (quoting *Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47 (2d Cir.1998)).

### C. Application of Law to Facts

■ Defendants argue that plaintiff's counsel unfairly influenced the verdict by

"repeatedly insert[ing] himself, his beliefs and his own credibility into the proceedings."

While some of counsel's remarks exceeded the bounds of current notions of propriety, his statements did not unfairly influence deliberations or the verdict. In the context of the summation as a whole, counsel's inartful comments were attempts to focus the jury's attention on the credibility of plaintiff's witnesses, their lack of motive to lie, and other holes in defendants' evidence. Where counsel strayed, he was admonished to focus on the evidence rather than insert himself into the case.

Some of counsel's remarks, although personal in nature, were fair comments on the evidence adduced at trial. On cross-examination, defendants asked Shakima Jones a series of pointed questions about her close collaboration with plaintiff's counsel during plaintiff's criminal trial and her preparation for the civil lawsuit. Trial Tr. 184:18–189:15. Defendants similarly quizzed Vincent Holmes about his prior conversations with an investigator hired by the plaintiff, though Holmes (who was testifying under subpoena) adamantly denied cooperating with plaintiff. Trial Tr. 278:24–281:3. Having solicited testimony suggesting plaintiff's counsel may have coached witnesses on how to testify, defendants cannot have expected plaintiff's attorney to remain entirely mute on the subject in summation.

The comments here are not like those at issue in *Cusumano v. N.Y. City Transit Auth.*, 75 A.D.2d 801, 427 N.Y.S.2d 644 (2d Dep't 1980), upon which defendants rely. There, the attorney stated during summation, "Believe me, there's plenty more in this case that I can't say," and vouched for a witness's testimony by saying, "I would swear on my God-damn life in this case as to what happened and whether or not the motorman is at fault or the Transit Au-

thority is at fault." *Cusumano*, 75 A.D.2d at 802, 427 N.Y.S.2d 644. Plaintiff's counsel's comments are pallid by comparison.

Any slight prejudice that might have been caused by counsel's statements was remedied by the jury instructions. Jurors were instructed on multiple occasions that summations' were "not evidence" and that their deliberations should focus on the evidence introduced at trial. Trial Tr. 573:21–574:2; *see also* Final Jury Charge, Ct. Ex. 1, Dec. 12, 2013 ("A lawyer's questions without an answer, arguments, and opening and closing statements are not evidence."); *accord Tesser*, 370 F.3d at 322 ("The jury was further cautioned, that '[t]he questions, arguments, remarks and summations of the attorneys are not evidence....'"). If defendants felt that was inadequate at the time, they were free to request an additional curative instruction.

The case turned on the jury's assessment of the credibility of plaintiff's witnesses and defendants, not the personal credibility of plaintiff's attorney. The summations did not poison the trial.

## IX. Discharge of Juror 8

### A. Facts

On the morning of December 17, 2013—the last day of deliberations—Juror 8 telephoned the courthouse. The clerk reported in court that "Juror number eight called to say that he is ill. He is on his way to see his doctor." Trial Tr. 674:7–674:8. The clerk later added that "[Juror 8] suffers from high blood pressure and says that he has been ill for the past two days." Trial Tr. 675:25–676:1.

Defendants objected to Juror 8 being discharged and to "going forward without a full complement of jurors." Trial Tr. 675:1–2. Defendants' counsel informed the court that Juror 8 was overheard, while leaving the courthouse the night be-

fore, stating, "I hope they don't ever pick me again. I'm sick of being here and the like." Trial Tr. 677:12–677:13.

Juror 8 testified under oath via telephone at the March 21, 2014 hearing. He explained that his physical condition "was horrible" on the morning of December 17 and that he was suffering from chest pains, anxiety, and "some bleeding." Hr'g Tr. 72:25–73:1. He confirmed that he was "absolutely not" physically capable of continuing with deliberations. Hr'g Tr. 73:7. When asked if he felt "pressured off the jury," Juror 8 signaled that he felt some general pressure related to the deliberation process, but expressly rejected the suggestion ("no, no, no") that he was pressured off the jury. Hr'g Tr. 73:22–73:23.

### B. Law

"During trial or deliberation, the court may excuse a juror for good cause." Fed. R.Civ.P. 47(c). This provision "makes it clear that the court may in appropriate circumstances excuse a juror during the jury deliberations without causing a mistrial." Fed.R.Civ.P. 47(c) Advisory Committee's Note. "Sickness [is an] example[ ] [of an] appropriate grounds for excusing a juror." *Id.*

### C. Application of Law to Facts

 Juror 8 was properly excused for illness. He was physically unable to continue with deliberations. The Rules permit the court to excuse jurors in such circumstances. *See* Fed.R.Civ.P. 47(c). Other available courses of action—a pause in deliberations until Juror 8 was able to resume, or a declaration of a mistrial on the morning of December 17—were not tenable alternatives.

Defendants argue that Juror 8's purported overheard statement on December 16 was a "red flag" signaling that he was likely a "hold out," and that the court should have conducted a more thorough investigation prior to ordering the resumption of deliberations. *See United States v. Thomas,* 116 F.3d 606, 622 n. 11 (2d Cir. 1997) ("The courts must in all cases guard against the removal of a juror—who aims to follow the court's instructions—based on his view on the merits of a case. . . . Accordingly, if the record raises any possibility that the juror's views on the *merits of the case,* rather than a purposeful intent to disregard the court's instructions, underlay the request that he be discharged, the juror must not be dismissed.") (emphasis in original).

This argument fails for two reasons. First, while Juror 8's alleged comment ("I'm sick of being here") indicated frustration with the deliberation process, it was not a "red flag" signaling that he was a "hold out." It would be surprising if an active and involved juror was not growing somewhat frustrated after three days of deliberations. The comment alone was not enough to trigger a fuller investigation on the court's part. Second, any further investigation would have confirmed what was already known: that Juror 8 was sick, in the process of obtaining medical relief, and physically unable to continue with deliberations. The dismissal was warranted.

## X. Plaintiff's Prior Incarceration

### A. Facts

Plaintiff provided at trial a brief factual description of the thirteen months he spent incarcerated at Rikers Island and Metropolitan Detention Center (MDC) in Brooklyn. He stated that at Rikers Island he was housed "in the dorm with like 50 other people." Trial Tr. 525:24–525:25. There was a common toilet, occasional inmate fights, limited phone calls, and limited time for outdoor recreation. Trial Tr. 525:25–526:18. At MDC, plaintiff was

housed in a double bunk cell with another inmate. Trial Tr. 526:21–22. There was a shared toilet and sink in the cell, occasional inmate fights, limited phone calls, and limited time for outdoor recreation. Trial Tr. 526:22–527:12.

Defendants represented at a sidebar that "plaintiff has spent at least half of his life incarcerated in jail." Trial Tr. 529:6–7. Defendants sought leave to "get into plaintiff's criminal history—sorry, not his criminal history—but at least his criminal incarceration," on the theory that plaintiff "would not be as—for lack of a better word—damaged [by this experience] as a person who has never been to jail." Trial Tr. 529:9–529:17.

The court recognized that "[t]he [proffered] evidence may have some relevance," but rejected it because "its prejudice far outweighs the probative force." Trial Tr. 529:19–529:20.

### B. Law

"The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed.R.Evid. 403.

### C. Application of Law to Facts

 The evidence was properly excluded. Evidence of plaintiff's jail time carried a grave risk of unfair prejudice, confusing the issues, and misleading the jury. A party's past encounters with the law are generally excluded not "because character is irrelevant; on the contrary, it is said to weigh too much with the jury and to so overpersuade them as to prejudge one with a bad general record and deny him a fair opportunity to [litigate his case]. The overriding policy of excluding such evidence, despite its admitted probative val-

ue, is the practical experience that its disallowance tends to prevent confusion of issues, unfair surprise and undue prejudice." *Michelson v. United States,* 335 U.S. 469, 475–76, 69 S.Ct. 213, 93 L.Ed. 168 (1948).

The evidence would have had limited probative value. Plaintiff described the basic loss of liberty any inmate experiences at Rikers Island and MDC. He did so briefly and in bare, factual terms. There is no reason to believe his previous jail experience would have significantly alleviated his distress at being wrongfully deprived of his basic freedoms during the thirteen months he was jailed.

## XI. Plaintiff's Prior Convictions

### A. Facts

On May 29, 2003, plaintiff was convicted and sentenced to 42 months in prison for attempted criminal possession of a loaded firearm, a class E felony. On October 17, 2003, plaintiff was convicted and sentenced to three years in jail for criminal possession of a loaded weapon in the third degree, a class D felony.

Plaintiff moved *in limine* to preclude defendants from eliciting testimony concerning plaintiff's criminal history. The motion was granted on Rule 403 grounds. *See* ECF No. 68.

### B. Law

A witness's character for truthfulness generally may be attacked by evidence of a criminal conviction that was punishable for more than one year, subject to Federal Rule of Evidence 403. Fed.R.Evid. 609(a)(1).

### C. Application of Law to Facts

 Evidence of plaintiff's ten-year-old convictions was properly excluded. Evi-

dence of the prior convictions would have been highly prejudicial in this case, which (like plaintiff's prior convictions) involved a firearm. The jury might have improperly inferred that it was more likely the plaintiff did possess a firearm at this time—as defendants claimed—because he was convicted of firearms offenses ten years ago. The probative value of this evidence was minimal: the prior convictions would shed little light on the witness's character for truthfulness. The danger of unfair prejudice substantially outweighed the probative value of the evidence.

## XII. Conclusion

It cannot be concluded that the verdict constituted a miscarriage of justice or that the result was seriously erroneous. The evidence firmly supported the verdict. None of the claimed errors—alone or in combination—would have caused a reasonable juror to find no liability.

No trial can be perfect. The charge that the police officers conspire to, and carried out, a plan to falsely imprison plaintiff was bound to create tensions and acrimony, particularly after plaintiff's acquittal at the criminal trial. Defendants had a sound and fair jury trial. They have not demonstrated that an injustice was done requiring a retrial.

Defendants' post-trial motions are denied.

SO ORDERED.